**1810.**

Sunbury,
Monday,
June 11.

CARKHUFF *against* ANDERSON.

A judgment in *Pennsylvania* is a lien on every kind of equitable interest in land, vested in the debtor at the time of the judgment; *Held* therefore to bind the interest of a *Connecticut* settler in land within the *Seventeen Towns*, who was intitled by the act of 1799 to obtain a patent upon terms, although not he, but his assignee, after the judgment and the sale, complied with the terms, and then for the first time obtained the confirmation.

The copy of a *Connecticut* settler's deed deposited according to act of assembly in the land office, is, if certified under the seal and signature of the proper officer, as good evidence as the original would be.

THIS was an appeal from the decision of the Chief Justice at a Circuit Court for *Luzerne* in *June* 1809.

It was an ejectment for a tract of land within one of the seventeen townships, to which the plaintiff set up a title under a certain *William Craig*, who held it as a *Connecticut* claimant by deed dated the 30th *June* 1798. On the 4th of *April* 1799, the commonwealth of *Pennsylvania* by an act of the general assembly, gave to the *Connecticut* settlers within the seventeen townships, whose rights had been acquired under *Connecticut* prior to the decree at *Trenton*, an option to receive a patent for their tracts upon paying a sum of money, provided the *Pennsylvania* claimant of the same land should release it to the commonwealth. On the 5th of *September* 1799, a judgment was obtained against *Craig* by *Matthias Hollinback*, who revived it by *scire facias* in *January* 1803, levied upon the land in *August* following, and finally in *August* 1806 caused it to be exposed to public sale by the sheriff, from whom it was purchased by *Carkhuff* the plaintiff.

In order to shew that the defendant held under *Craig*, the plaintiff's counsel offered in evidence on the trial, a copy of a deed from *Craig* to *Anderson*, dated the 10th *January* 1801, for the land in question, certified by the secretary of the land office, under his official seal, to be a true copy of the original deposited in his office; and which, by the copy, appeared to have been proved by a subscribing witness. This evidence was objected to, but was admitted by the Chief Justice, under the authority of an act of the 9th of *April* 1781. Parol evidence was then given to shew *Craig's* continuance in possession until some time in 1803, and the defendant's knowledge of *Hollinback's* judgment and execution in that year.

The defendant relied upon a patent from the commonwealth, dated the 30th *November* 1808, which he had claimed and received under the act of 4th *April* 1799.

The only points in the cause, were, whether the judgment

against *Craig* operated as a lien on the land held by him under the *Connecticut* title; and whether the certificate of the secretary of the land office was competent evidence; and in order to bring these points before the Supreme Court, it was agreed that a verdict should be entered for the plaintiff, and that a motion for a new trial should be overruled, to ground an appeal by the defendant.

*Evans* for the appellant, contended upon the first point, that at the time of *Hollinback's* judgment, *Craig* had no title to the land which was recognised by the law of *Pennsylvania*. He had not even an equitable right to it, because it had been solemnly settled by the decree at *Trenton*, and had been repeatedly asserted by *Pennsylvania* in her legislative acts, that *Connecticut* was wholly without pretence of title to this district of country, and that the settlers under her were of course but mere trespassers. All that the act of 4th *April* 1799, 4 *St. Laws* 400, had done, was to give to the *Connecticut* settler an option to obtain a title by performing certain conditions. But he remained in his former situation until the election was made. There was no compulsion upon him ever to accept the terms; and it did not appear at the date of the judgment that he ever would accept them. In fact *Craig* never did. The question then is not whether a judgment will bind an equitable interest in lands, but whether it is a lien upon a mere claim or pretence, which the possessor makes against the law of the land, and which after the judgment he transfers to a third person. There can be no doubt that it is not.

The copy of the deed could not have been evidence, the original being in existence, unless made so by statute. The act, under which the original of the deed was deposited in the land office, does not authorize the secretary to give a copy of it; it contains no other provision, but that *Connecticut* settlers applying for the benefit of the act of 1799, shall surrender to the commissioners all deeds and documents of title under the Susquehanna Company, to be transmitted to the secretary. But there it stops. 5 *St. Laws* 206. There should have been a subpœna to the secretary, with a clause of *duces tecum*. The act of 9th of *April* 1781, 1 *St. Laws*

891, does not apply to the case. That act makes copies of deeds, entries and papers of the land office, duly attested by the respective officers, under their hand and seal of office, as good evidence as the original could be. But the deed of a *Connecticut* settler is not a deed of the land office; nor was it intended by the legislature that any paper should be deemed to have that character except where it emanated from the land office, and where the same authority vouched both original and copy.

*Dyer* and *Hall*, for the appellee, argued, that whatever might have been the nature of *Craig's* claim before the act of *April* 1799, yet from the date of that law he had an equitable right to the land, something in the nature of a preemption, a conditional equity, which it was in his power, and in the power of his assignee to make absolute, and which accordingly was made so by the defendant. It was not in the power of the latter, to defeat *Hollinback's* judgment, of which he had both actual and constructive notice before he obtained his patent, by saying that *Craig* had no estate or interest in the land, when his defence rested upon the confirmation of that estate by the commonwealth. The confirmation being made after the judgment and sale, is of no avail to defeat the judgment creditor and the purchaser under him. If tenant in tail mortgages for years, and then suffers a common recovery, this lets in the mortgage; *Beck* v. *Welsh*, (a); and upon the very principle which lets us in to the benefit of the confirmation by the state; namely, that he who recovers, cannot say that *he* against whom he recovered had but an estate tail. Certainly, *Craig* had at least a preemption right. Now that kind of right was held in *Duncan* v. *Walker* (b) to be an interest in the land, and to descend to the heir; and if it is an interest in land, it is bound by a judgment, which in this state fastens upon every interest in lands. After the compensating act of 1799, *Connecticut* titles to land within the seventeen towns, were uniformly considered as real estate, and went in the usual course of descent.

Upon the question of evidence, the appellee's counsel were stopt by the Court.

(a) 1 *Wils.* 276.        (b) 2 *Dall.* 205.

TILGHMAN C. J. There is one point in this cause on which I shall give no opinion, because I gave an opinion on the trial in the Circuit Court; that is to say, whether the copy of a deed from *William Craig* to the defendant, certified under the hand and official seal of the secretary of the land office, the original being deposited in the said office according to the provision of an act of assembly, was legal evidence? My opinion was, that it was evidence.

But on the principal point of the cause, which is of considerable importance to the people of *Luzerne* county, I gave no opinion on the trial; it being agreed by the parties that the matter should be brought before this Court. I will briefly state the facts on which the point turns. *William Craig* had title derived from the state of *Connecticut* to the land in dispute. Being in possession under this title, *Matthias Hollinback* obtained a judgment against him on the 5th *September* 1799. A *sci. fa.* issued on this judgment to *November* term 1802, on which judgment was entered *January* 1803. A *fi. fa.* issued to *August* 1803, which was returned "levied" on the land in dispute. The land was afterwards sold by a regular course of proceeding to the plaintiff, who received a deed from the sheriff of *Luzerne* county, dated 26th *January* 1807. The land lies within that part of the county, known by the name of the *Seventeen Towns*. The defendant on the 10th *January* 1801 purchased the same land of *Craig*, and obtained a deed from him. The defendant afterwards laid his title before the commissioners appointed under the act of 4th *April* 1799, intitled "An act for offer- "ing compensation to the *Pennsylvania* claimants of certain "lands within the seventeen townships of *Luzerne*," &c. &c. and obtained a patent from the commonwealth, dated 30th *November* 1808.

The question is whether the judgment of *Hollinback* was a lien on this land? The defendant contends that it was not, because at the time of the judgment, *Craig* had no title which was of any validity under the law of *Pennsylvania*, and that the title obtained by his patent, is to be considered as an original title, emanating from the commonwealth on the day of its date.

It is well known that the state of *Connecticut* once made

1810.

CARKHUFF
v.
ANDERSON.

an unfounded pretension to part of the land included in the charter of *Pennsylvania*, and that the title has been repeatedly and solemnly decided in favour of *Pennsylvania*, both in the courts of the *United States*, and of this state. It is also well known, that the title under *Connecticut* has been reprobated by various acts of assembly. But it is very material, that prior to this judgment, the above mentioned act of 4th *April* 1799 had passed, by which it was proposed, that those persons who held lands under a *Pennsylvania* title within the *Seventeen Towns*, should release to the commonwealth on receiving compensation, and in that case the title was to be confirmed to those persons who had acquired rights under *Connecticut*, prior to the decree at *Trenton*, provided they came forward, and proved their title before commissioners appointed by virtue of that act, and complied with the terms prescribed by the act. It cannot be said that *Craig* had no interest in the land after this act of assembly. He had the right of preemption, on the contingency of the *Pennsylvania* claimant's releasing to the commonwealth, which in this case has been done. And this right of preemption, he conveyed to the defendant for a valuable consideration, who has availed himself of it, and by means of it, obtained a complete legal title. It is therefore with an ill grace, that the assertion, of *Craig's* having no interest, comes from the mouth of the defendant. But it is said, that although *Craig* had the right of preemption, he was at liberty to pursue that right or not. This argument can have no weight, because his assignee has pursued it. A person who holds land under an application entered in the land office of the late proprietaries, and a survey, without having paid any part of the purchase money, might as well allege, that a judgment is no lien on his land, because he is at liberty to give up the land, and never complete his title. And yet the lien in that case would not be contested. The lien of judgments has been extended in *Pennsylvania* beyond the limits of the common law. In *England*, a judgment is not a lien on an equitable estate. But in as much as we have no court of Chancery, which is resorted to in *England*, to obtain relief in equitable cases, we have been compelled, in order to obtain equity, to alter the principles of the common law.

Accordingly it has been long settled that a judgment is a lien on every kind of *equitable* interest in land. It is a lien on every kind of right, vested in the debtor at the time of the judgment; and on the *vend. exp.*, the sheriff sells and conveys all his right, such as it may be. I am therefore clearly of opinion, that *William Craig* had an interest which was bound by the judgment of *Hollinback.* I desire it to be understood, that I do not mean to give any opinion, except on the point submitted to the Court, viz. whether *Craig* had an interest capable of being bound by the judgment. If the point had been, whether the defendant would not have a right to hold the land, until he is reimbursed the money, which he may have paid the commonwealth for the confirmation of the title, that would have been a very different question.

YEATES J. I am perfectly satisfied that the lands in question, were bound by the judgment of *Hollinback.* I have nothing to add on that point.

The question, whether the copy of the deed from *William Craig* to the defendant *John Anderson*, duly certified by the secretary of the land office, under his hand and official seal, should have been admitted in evidence in this case, presents itself to us for decision on the appeal.

The commissioners, appointed under the act of the 4th *April* 1799, were authorized to ascertain the rights or lots of *Connecticut* claimants within the seventeen townships in the county of *Luzerne*, who were settlers there at or before the time of the decree at *Trenton*, and which were particularly assigned to them, agreeably to the regulations in force among them prior to the said decree. The tenth section of the supplement thereto, passed on the 6th of *April* 1802, expressly directs, that the commissioners shall receive, from each *Connecticut* settler applying for a certificate, every deed and document of title under the Susquehanna Company, in the power or possession of such settler, previous to the issuing of any certificate for such lands, which should be transmitted to the secretary of the land office. The patent, issued in this instance to the defendant, does not recite the *Connecticut* settler, under whom he claimed and came into possession; and

1810.

CARKHUFF
v.
ANDERSON.

it became necessary that the plaintiff should shew this by legal proof.—It has been objected, that if the original deed could not be procured, the copy ought to be proved by witnesses, who compared it with the original, and that no law authorized the secretary of the land office, to certify such copies. I take it, that this case is governed by the plain words of the law of the 9th of *April* 1781. An office was thereby established, consisting of three persons, or officers, called the Secretary of the Land Office, Receiver General, and Surveyor General; and by the third section it is directed, that " copies " of *deeds*, entries, and papers of the said office, duly attested " by them, under their hand and seal of office, shall be as " good evidence, as the originals might or could be." It has been said, that the *deeds* here spoken of, mean patents, which are to be certified by the master of the rolls. But at the time of passing of this act, the master of the rolls was not a competent member of the board of property, and consequently the word *deeds* could not by any possibility have reference to him. The word must have some meaning as used by the legislature, and must necessarily include any deed deposited in the three offices by virtue of any legislative act or provision. Besides, the fee of the master of the rolls for exemplifying patents was pointed out by former laws, and his power herein in no degree depended on the act of 9th *April* 1781. It would be unnecessary to amplify on this subject. I am clearly of opinion, that the copy of the deed, certified as I have mentioned, was properly received in evidence on the trial, and that the judgment of the Circuit Court should be affirmed.

BRACKENRIDGE J. The question in this case has arisen from the history of legal tenure in that part of the county of *Luzerne*, which consists of what are called the Seventeen Townships. And I must assume this history as known, in order not to be under the necessity of going minutely into a review of it.

The appearance of right which the Susquehanna Company, a people of *Connecticut*, had, to advance a claim to this district of country, is in my mind, in considering the case before me. I do not view them in the light of trespassers, with

a full knowledge of their want of title. At all events, the bulk of them do not seem to have been apprised of their want of title. And I make a great distinction between trespassers knowing, or having good reason to know, their defect of title, and such as may reasonably be supposed to be ignorant of what they are about.

Before the decree of *Trenton*, the most intelligent, and the best informed, might have been led to believe, that the part of the country in question, was settled under a good title from the state of *Connecticut*. It was not so clear a case as not to admit of a difference of construction. Certain it is, that a body of people did settle on this district, under an idea of having a good title from the Susquehanna Company. By the decree of *Trenton*, it was ascertained that this allegation of title was without foundation. But in favour of those who had settled under the idea of a good title, and with an expectation of enjoying the land which-they were improving and defending, at great risk and much loss, from the common enemy during the revolutionary war, there is a claim, which ought not wholly to be disregarded. I do not call it a *right*, but a claim on the ground of moral obligation. It would have been an exaction of the *summum jus* on the part of the state, to have carried into effect their right, wholly disregarding such a claim. It would have been against good conscience in an individual to do it. It was a case where a demandant, recovering the freehold, ought not to take it without an allowance for labour expended, and improvements made. The state of *Pennsylvania* thought it against good policy to inforce the state right by process of law, and to dispossess the inhabitants; and I hold it to be a principle of humanity, and even of moral integrity, that wherever an individual has entered upon unimproved land, taking the history of the settlement of our country into view, he ought not to be dispossessed, provided he is able and willing to pay for the land in an unimproved state, with a reasonable allowance to the demandant for his trouble, expense, and time lost in pursuing his right, and what in equity he ought to have, taking all circumstances into view. I can have no hesitation in saying, that the government at all times, in such cases, where the title comes from them, or where they are called upon by uncom-

1810.

CARKHUFF
v.
ANDERSON.

mon means to inforce the state right, are justifiable in refusing the process of law to dispossess, or the aid of uncommon means, the *posse comitatus*, or militia; in consideration, at the same time, that they, the government, are willing to make a reasonable compensation to the demandant for lands of which, for their sakes, they are unwilling to dispossess the inhabitants. The *salus populi* gives what is called the *transcendental* right in such cases; the supreme law, to which all other considerations are subordinate.

It was on this principle that the act of the 28th of *March* 1787,for ascertaining and confirming to certain persons called *Connecticut* claimants, the lands claimed by them within the county of *Luzerne*, was passed; and though repealed by a subsequent act of 1st *April* 1790, and recited in the preamble to this act as unconstitutional, my ideas of it still remain the same, on grounds of policy and of natural justice which I entertained of it, when I gave my vote in the legislature, for the passing of it into a law; and though in the case of *Vanhorne's Lessee* v. *Dorrance*, 2 *Dall.* 304, this idea of the unconstitutionality of the act is sustained, yet it is on what appears to me a narrow view of the subject; and on this ground chiefly, that a constitutional compensation must be money, and not land; whereas it would seem to me that in cases like this, the constitutional compensation for land would be land, and not money. By the common law, where a man and his heirs are bound to warranty, "he is to yield other lands and tenements to the value of those that shall be evicted." *Co. Litt.* 364.

It is a principle of law, that one having no title at the time of conveying, but afterwards acquiring a title, to real estate, it shall inure to the use of the grantee. I should therefore incline to think, that the possession under claim of title, which the *Connecticut* settler had prior to the decree of *Trenton*, might have been bound by a judgment, so that the after-acquired title should inure to the advantage of the judgment creditor. But be this as it may, by the act of the 4th of *April* 1799, for offering compensation to the *Pennsylvania* claimants in certificates, in case of lands settled before the decree of *Trenton*, and to the *Connecticut* settlers of this description, patents from the commonwealth on instalments to be

paid, the claim of the settler became a right known to the law, and beyond all question the subject of a lien. It became an *estate in equity*, which is the subject of a lien in *Pennsylvania*. It shall not lie in the mouth of him purchasing and taking the advantage of this kind of title, whatever it might be, to allege that it was such an interest as could not be considered real estate, and the subject of a lien. He took it *cum onere;* and it would seem to me that a judgment was binding on it from the legal or constructive notice of the record, independent of the actual notice in this case.

1810.

CARKHUFF
v.
ANDERSON.

I can make no distinction, in respect of the attachment of a lien, between the interest in the land, which the *Connecticut* settler had after the 4th of *April* 1799, and that of any other real estate held by an equitable title, that is, under an agreement to be carried into effect. It was considered real estate by the judgment creditor, and in the general understanding of the country; and *communis opinio* is of authority. *Co. Litt.* 365. Were it necessary to pursue the analogy of law to some extent, I should think the case adduced of a tenant in tail, having a judgment against him, and suffering a common recovery, the judgment against the tenant in tail, attaching on the fee simple which he has acquired, is in point. It is a question said not yet to be decided here, whether after-acquired lands are bound by a prior judgment; but I can have no doubt, but that where there is the inception of a title, such as a court of Chancery would carry into effect, it may be bound. The case of a preemption right alluded to, bears upon this, and establishes an analogy.

Judgment affirmed.