## McNAIR ET AL. *vs.* O'FALLON ET AL.

A. being indebted to B. In the sum of 5,500 dollars, on the 26th January, 1820, executed to him his bond for that sum, payable one year after date, secured by mortgage on certain real estate of A. On the 30th November, 1820, A. executed another bond to B. for the payment of 500 dollars at one year, secured by mortgage on same property. On the 17th April, 1821, A. mortgaged to B. certain other real estate, to secure the payment of the further sum of 3,951 dollars.

B., in 1823, commenced suit against A. on the first-mentioned bond, and in 1824 recovered judgment against him for the amount thereof; and under said judgment all the real estate in the first-mentioned mortgage, and all the real estate in the last-mentioned mortgage, situate in St. Louis county, were sold by the sheriff, and, with the exception of one lot, purchased by B., for the sum of 2,700 dollars.

After this sale, in 1824, B. filed his petition against A. in St. Louis Circuit Court, to foreclose the equity of redemption to all the real estate included in the last mortgage, situate in St. Louis county; upon which judgment was rendered, that unless A. pay the mortgage debt on or before the 3d November, 1825, &c., that the mortgage premises be sold, &c. No steps were ever taken to carry into effect this judgment. The heirs of A. filed their bill to redeem the real estate included in the above mortgages, &c. *Held:*

1. That an equity of redemption could be sold on an execution at law, previous to the revision of the Statute Laws in 1825, as well as subsequent to that revision.—See 1 Territorial Laws, 1807, ch. 38, sec. 42, 45, p. 120.

2. That where a mortgagee institutes suit at law to recover the debt secured by the mortgage, and obtains judgment for the amount of the debt, he will not be allowed to sell the equity of redemption, under execution on such judgment. Therefore, the sale of the mortgaged property by B., under the judgment obtained on the bond for 5,500 dollars, in 1824, was void, and the heirs of A. had a right to redeem the real estate in the first mortgage.

3. That the proceedings on the petition of B. for the foreclosure of the real estate included in the last mortgage, amounted to an admission by B. that A. had a right to redeem the lands included in that mortgage.

## APPEAL from St. Louis Court of Common Pleas.

LAWLESS *and* NABB, *for Appellants.*

1. An equity of redemption, on the 6th October, 1824, was the only interest to which McNair and Wife were entitled, and which, at that time, could not be the subject of levy and of sale, on a *fi. fa.* at law.

2. If an equity of redemption at that time was saleable on *fi. fa.* at law, it could not legally apply to this case; because the *fi. fa.* was on a judgment at law, obtained on the mortgaged debt.

3. If saleable on *fi. fa.*, John Mullanphy, mortgagee, could not become a purchaser at the sale.

4. The conduct of Mullanphy, at the sale, was oppressive and fraudulent, and thereby, by denying a competition of bidders, and otherwise, depreciated the value of McNair's interest and property.

I. An equity of redemption was the only interest to which McNair and Wife

were entitled on the 6th October, 1824, which interest neither then was, nor could be, sold, under the statutory provisions of Missouri, nor at common law, or *fi. fa.*, or general judgment.

1st. As to the interest of McNair and Wife, on 6th October, 1824,—*Vide* record, the several mortgages at pages 46, 51, 76; *vide* return of sheriff, p. 70; *vide* p. 76, as to the judgment; *vide* return of sheriff on judgment, 5500, p. 77, 78; *vide* p. 79, as to the proceedings at law.

2d. At common law, an equity of redemption not saleable.—*Vide* 1 Pow., 258, note R.; 1 Mad. Ch., 522; 4 Kent, 160; 1 Pick., 399.

3d. An equity of redemption is an estate derived from every contract of mortgage, and possesses the inseparable incident of foreclosure, which must be had through a *judicial decree.*—4 Kent, 135; 1 Pow., 116; 2 Johns. C. Rep., 100.

4th. And before foreclosure, no act of mortgage can effect, in any way, the right of redemption in mortgage.—*Vide* Wilson *vs.* Twup., 7 Johns. C. Rep., 37, 38; 9 Cow., 358, 360, 361, 371, 389, 390, 391.

5th. An equity of redemption, being a *mere creature* of equity, is an estate and interest *sui generis*, and *can only* be construed, understood and enforced by a power residing in a court exercising chancery power.—*Vide* Fonb., 227; 4 Kent, 163; 1 Mad. Ch., 451; 3 Bin., 8.

6th. An equity of redemption being thus a creature of equity, partakes of, and is, in fact, a *trust estate;* if not *express*, certainly a constructive trust, which could only be sold under statutory provisions, where the common law is recognized.— 1. In England, a trust estate not saleable before 29 Charles II.; 8 East, 482; 24 Law Lib., 298; 1 Vesey; Case of Lysler *vs.* Dolland, 1 Pow. on Mort., p. 255, note K.

If trust estate be not saleable at common law, and in England, only by statute of 29 Charles II., an equity of redemption being, as aforesaid, peculiar trust estate, was not embraced in the provisions of 29 Charles II., because the words, "lands, tenements, and hereditaments," &c., did not contemplate "an equity of redemption," for the words "equitable interest" were not embraced; showing by the absence of the word "equity," nothing can be inferred in a statutory provision.—8 Peters, 691; Sanders, H. and T., p. 191; also, note X, for the words, 2 statute of Chas. II.; 1 Power, 257, note; 1 Ves., 431; 7 Pick., 51; 13 Peters, 294; 5 Harris and Johnson, 315.

An equity of redemption could not have been contemplated by the Legislature of the Territorial Government.— Geyer's Dig., title, "Judicial Proceeding," sec. 63, 66; *Ibid.*, p. 307, title, "Mortgages," being an express provision for the sale of mortgaged estates.

This statute must be strictly pursued by the party, mortgagee, and while there existed no chancery power, a common law court was entered to be the forum for the remedy, which cannot change or affect the principle in equity, to wit, that "once a mortgage, always a mortgage;" and being such, there arises an incident of foreclosure, which must be disposed of before the right of mortgagor can be released or annihilated, either by special contract or judicial sentence; consequently, the power was given to the common law courts through which to obtain

relief, clearly showing, that though a remedy is in a court of common law, yet it may become the vehicle of effecting it.—1 Dallas, 211; Laussett's Equity, 41, 44; 13 Peters' Rep., 294; 13 Johns. Rep., 551, 102; 11 Mass., 165; 9 Cowen, 182.

It is admitted by the court below, that this was an Anglo-American mortgage. If so, the interest is purely equitable, and is contradistinguished from legal interest; and being so, could not be affected by affording a remedy in a court of common law.

This view arises from several acts of Congress, relating to judiciary powers in territory of Louisiana, and then the territory of Missouri.—2 Story, 938, sec. 13, 975, sec. 1, ch. 99; 3 Story, 1255, passed 4th June, 1812; *Ibid.*, 160–163, passed 29th April, 1816. Also, in Geyer's Digest, several titles of mortgage, and other titles showing a distinction between law and equity: also, the introduction of equity of power in 1811, p. 124, title, " Common Law."

Thus, the whole system of legislation in Congress and the Territory shows, from the commencement to act of 1839, that there is a negation to sale of equitable right.—See, also, the reasoning of the court by Lord Ellenborough, in Scott *vs.* Scholey, 8 East, which shows the injustice of other doctrines: also, note K, in Pow., 255.

It was objected in argument below, that no other creditor than mortgagee could enforce payment of his debts. To the fallacy of such reasoning, I refer the court to 1 Geyer's Digest, title, " Mortgage"; 1 Pow., note B, 261; 13 Law Lib., 108.

As to the policy of protecting the rights of mortgagors or mortgagees, *vide* Sugd., p. 128; 1 Johns. C. Rep., 30.

Compare the statutes with the provisions of equity Charles II., (Saund. H. and T., note X; Geyer's Digest, title, "Jud. Pr.," sec. 63, 66,) and decisions in other States whose statutes contain like provisions, *vide* Hardin's Rep., p. 19; 1 Saxton, 304.

If an equity of redemption be real estate, a judgment would be a lien on it, and an innocent purchaser might be affected.—1 Johns. C. Rep., 55; Hart *vs.* Reeves, 5 Hayw., 58, (which I cannot find but by reference.)

If an equity of redemption be saleable, it must be levied on as such.—Con. Dig., 105, 518; 1 Pow., note, p. 255; 7 Pick., 51; 4 Pick., 160; 8 East, Scott *vs.* Scholey.

If saleable at law, an equity of redemption could not be sold on a judgment on mortgage-debt.—Perry *vs.* Barker, 8 Ves., 527; 10 Johns., 482; 1 Pick., 352, 3, &c., Atkins *vs.* Sawyer; 4 Pick., 133, 4, &c., Crane *vs.* Marship; 4 Pick., 253, Curling *vs.* Hardin; Schottenkerk *vs.* Whale, 3 H. Rep., 279.

As to the election of mortgagee to sue on bond, he thereby waives his right against the mortgaged property.—3 Johns. C. Rep., 330, Dunkley *vs.* Van Beuren.

The mortgagee cannot become the purchaser on debt mortgaged, at judgment at law, at his own sale. If so, the mortgagee may still redeem.—4 Hen. and Munf., 101, Dabney *vs.* Green; Tea *vs.* Annan, 2 Johns. C. Rep., 127; 1 Pick., 354; Pow., 1001.

The mortgagee is regarded *quasi* trustee, at least, to mortgagor, after forfeiture. 1 Mad. Ch., 512; 1 Pow., 330, and part of note M to p. 330; 1 Pet. S. C. Rep.,

441; Conrad *vs.* Atlantic Co., 1 Mo. Rep., case of Carr and Holbrook; 2 Merivalle, 259, 260; 13 Johns. Rep., 555–558; Cowen, 378.

As to the hostile attitude mortgagee bears to mortgagor, that does not evade the principle, any other than that of Creditor *vs.* Debtor; but as every creditor on simple contract has his remedy, which is as necessary to be pursued, as the creditor or specialty must pursue the action prescribed to him.

It is contended, that if Mullanphy purchase any interest, it was the equity of redemption of McNair, and not Mrs. McNair's whole equity of redemption arising on her contract as well as that of Alex. McNair; and it is not for the defendants to deny the ability of Mrs. McNair to make contract, or bond and mortgage, in both of which she joined.

If mortgagee could evade the remedy pointed out by the statute, it would nullify the act of 1807, and the mortgagee then become his own purchaser; and the consequences of oppression would be apparent.— 2 Johns. C. Rep., 30.

If the doctrine of merge be called in, in aid of the bill of the mortgagee, on the hypothesis that he could purchase, the courts of equity apply it according to the intention of the mortgagee, purchaser, to be determined by his own acts. In this case we refer to the petition of foreclosure of mortgage, of 17th April, 1821, to show his admission of existence of mortgage, and thereby the equity of redemption in Mr. and Mrs. McNair.—*Vide* 10 Johns., 482; in case of James *vs.* Morer, 4 Wend., 24–26.

Fraud may be inferred from fiduciary relations, or the relation of mortgagor and mortgagee, when mortgagee departs from the prescribed boundaries given him by statute to recover his debt.—2 Sch. and Lefroy, 673; 1 Story Eq. Com., 198, sec. 188, 190; 18 Ves., 483; 2 Story, 200, 266; 2 Johns. C. Rep., 30; 5 Gill and Johns., 75; Pow., 124, note 2.

From fact of interference at sale — Sug., 127.

As to inadequacy of price — 14 Ves., 240.

Evidence of Dent, Evans, and all the circumstances.

SPALDING, *for Appellees.*

The appellees make the following points:—

I. Equity of redemption passed by sheriff's sale, on the judgment on the bond. —Geyer's Dig., 266, 267, sec. 63, 64, 66; Edwards' Comm., 855, sec. 3; Acts of Assembly of 1821, '2, p. 93, sec. 61, as to liens of judgments on "real estate."

See 3 Miss. Rep., 492, and 4 Miss. Rep., 319, 380: That mortgage in Missouri is not the same thing as in England.

3 Martin's Rep., (old series,) 574; 4 *Ibid.*, 397; 5 *Ibid.*, 634: To show that, under Spanish laws, which formerly were the law here, an equity of redemption could be sold on execution; and the last case was a judgment in favor of the mortgagee, on the mortgage debt, and under those laws there was no distinction of estates into *equitable* and legal.

The custom was to sell equity of redemption here always. The words, "lands

and tenements," &c., were used to comprehend all interest in lands.— See Territorial Laws *passim*.

1 Caine's Cases in Error, 46: That equity of redemption can be sold, on judgment and execution.

4 Johns. Rep., 41; 6 *Ibid.*, 290; 7 *Ibid.*, 278; 11 *Ibid.*, 538; 19 *Ibid.*, 325; 5 *Ibid.*, 454; 2 Cowen's Rep., 195: These New York cases show that the mortgagor is held to be the owner substantially; that the wife has dower in the equity of redemption, &c.

1 Johns. C. Rep.: Equity vendible on execution, on principles peculiar to mortgages.

1 Day's Rep., 93: That equity of redemption can be taken on execution in Connecticut.

9 Cranch, 456, 485, 6: That the same is true, as to attachment, in Maryland, under the words, "lands, tenements," &c.— See 5 Haw. and Johns., 551.

13 Peters' Rep., 294: That in many of the States the mortgagor is viewed as the owner, &c., in a court of law.

1 Shep. Touch., 91: Defining tenements and hereditaments; note 2 also.

Saunders on Uses, 186; Lewen on Trusts, 216: Equity of redemption is not a trust.

That mortgagee can sell on judgment on the mortgage debt, and buy, himself, see the following authorities:— 2 Johns. Ch. Rep., 125, Tice *vs.* Annan; (in this case the chancellor holds the sale valid, and decrees accordingly; and intimates, as the proper remedy, that on application in time, he will enjoin such a proceeding;) 10 Johns. Rep., 481; 2 Halsted's Rep., 409; 3 Martin's Rep., 574.

The following were cited by appellants on this head:— 4 Hen. and Mun., 101; 7 Dana, 65; 1 Pick. Rep., 351.

Neither the first nor the last of these cases were decided on the ground, that an equity of redemption cannot be sold on a judgment on a mortgage debt. A judge in each case intimates his opinion to that effect. The second turns on the local laws of Kentucky.

6 Miss. Rep., 273: A mortgagee can sell under a power.

II. The mortgagee has a right to buy at the sheriff's sale, and he is not trustee in any such sense as to prevent his bidding, particularly in this country.—3 Powell's Mortgages, 1154, *a*; 1 *Ibid.*, 122, 127, *a*.

III. An equity of redemption does not, of necessity, remain till foreclosure; but it may be extinguished by payment or release, or by sale of it to mortgagee.— 1 Powell, 307; 3 Johns. Ch. Rep., 56; 6 *Ibid.*, 417; 5 *Ibid.*, 35, 214; 2 Cowen's Rep., 246.

These cases show that where the legal and equitable interests meet, there is a merger, as to so much of the property as is put in that situation.

IV. Mullanphy's conduct was not fraudulent, so as to invalidate the sale.

1st: His suing, when interest on his debts was in arrears several years, is no indication of fraudulent intent.

2d: Neither is his waiting several years after the mortgage property ceased to be good security for the debts, from its great depreciation,— which depreciation

commenced in 1820, and came to its height in the Fall of 1821, by the breaking of the Bank of Missouri.

3d: Nor could he have had any motive to cheat or oppress, as the mortgaged property in 1822, 1823, 1824, and 1825, was not of sufficient value, that if it sold at full prices at private sale, it would not have brought sufficient to pay half of the mortgage debt.— See testimony of J. K. Walker, William C. Carr, D. Hough, Charles Mullikin, Peter Lindell, Jesse Lindell, &c.

4th: The altercation with Rankin, proved by Evans and Dent, indicates no fraud. They had just before quarrelled, as Evans states, at a public sale, and it was renewed on the occasion of McNair's sales. Besides, he had a motive, not to pay high commissions.

5th: His conduct at the sale was not fraudulent. He gave a notice of the fact of his incumbrance.

6th: His remarks to Letcher, warning him not to build on the lot, indicated no fraud. If he wished to cheat, why did he not let Letcher build, and then hold his house on his mortgage?

7th: McNair lived some fifteen or eighteen months after this sale; if he was so much wronged, why did he not move to set it aside, or file his bill, while the facts were fresh, and witnesses alive and able to remember what took place?

8th: Seventeen years elapsed after that sale, before this suit was brought; and this laches in McNair and his wife and children, will render the court indisposed to rake up these matters.— 3 Miss. Rep., 516; 8 Cow., 384; 10 Peters' Rep., 473; 4 Dana's Rep., 441.

V. Mullanphy's heirs are not estopped from denying an outstanding equity, by the record of foreclosure.

This record refers only to the last mortgage at any rate, and does not embrace the three most valuable pieces of land.

The object of this foreclosure was, probably, to get at the lot that Rankin bought; and to do this, it was necessary, under the act, to proceed against Mc-Nair alone.

VI. Margaret S. McNair, the widow, has no right to redeem.

1st: Her right was relinquished by executing and acknowledging the mortgages.

2d: The sheriff's deed divested her right.— Geyer's Dig., 161, sec. 1, and 164, sec. 5; Edwards' Compilation, 399, 509.

3d: And she has lain by, and is guilty of laches fifteen years after her husband's death, and eight years after Mullanphy's death.

Acknowledgment of mortgage sufficient.— 4 Leigh's Rep., 498.

VII. Rankin's answer is not evidence against his co-defendants.—5 Johns. Rep., 412, 426.

VIII. The evidence which was excluded below, was rightly excluded. This evidence was of the sayings of McNair, and of course report.

These two last points cannot be taken advantage of under the assignment of errors, which is general.

IX. McNair was not wronged in any manner by the proceeding and purchase of Mullanphy, for the property was not worth half enough to pay the debts, and the

bonds have never been pressed for the residue of the debts, and after this lapse of time cannot be; nor has any resort been had to the several pieces of property, included in the mortgages, which do not lie in St. Louis county.

The prices below affixed to the several pieces of property sold on execution are higher than would have been got for the same property, if sold at private sale, in 1824. And it is to be remarked, that the complainants' witnesses do not appear to be qualified to judge of prices at that time, while the defendants' witnesses are proved to be among the best judges, from actual dealings at the time, and familiarity with prices and sales.

### Lands in First and Second Mortgages.

1.— 2 by 40 arpents, bounded east by Mississippi, in Morin tract, some four miles north of St. Louis.

2.— 7 by 40 arpents, situated by side of foregoing in same Morin tract. Take both of these at five dollars an arpent_____$1800

3.— Lot bounded south by Spruce-street, east by Main-street, about 100 or 120 feet front, on which is white house in Cross-street, and old French house on the corner _____$2000

—See testimony of Charles Mullikin, D. Hough, J. J. Purdy, W. C. Carr, H. S. Geyer, Jesse Lindell.

### Lands in Third Mortgage.

4.— Lot 25 feet on Main-street, by 75 deep, adjoining the foregoing ____$300
—Same witnesses.

5.— Lot by Joseph Papin and Valois, and by 40 arpent lots,—a barn lot, 60 feet front, without buildings. Letcher says, in 1820 or 1821 he offered to give $2000 for it. How or what he was to pay, or when, does not appear, but in 1824 the following price must have been several times its value_____$1500

6.— Lot bounded east by Esther, and north by cross street.—No value is put, by any of the witnesses, on this lot. I think it is 60 feet wide. Five dollars a-foot would have been a large price, according to the general state of things _____$400

— See Millikin's testimony as to Lawless' house, which is nearer this than any other that is valued.

7.— Lot sold to Rankin, 38 feet on a cross street, by 170 deep. This is on the same cross street with the lot mentioned above. The testimony that applies to that applies also to this _____$300

8.— 640 acres on the Merrimack _____$1280
— J. K. Walker.

As to the point that the marriage was under the Spanish laws, and that she has an interest in the community, and a right to redeem, I answer—

1. That the record does not show she was married before the American laws were passed, viz., before an act was passed giving dower, &c., and thus repealing the law of community.

2. That even if she was married then, and the marriage law was as it is said by Lawless to be, yet the record shows that the lands were acquired since the first act, giving dower, was passed. (See Hempstead's Digest, 132, sec. 6, 7, 15, 16, &c.; Edwards' Compilation, 128.) So that there was no community; then, of course, her only right was what the act gave her, that is, dower.

3. Even were there a community, the property of it was, by Spanish law and American law, liable for the debts of the community. The lands have been sold for the debts of the community.

4. She has also conveyed away her right, by joining in the deed without any redemption reserved.

6. No such pretence as community has been set up in the bill, and there can be no relief on a case not presented in the bill.


GAMBLE, *for Appellees.*

On the cause, as argued in the court below, the complainants' counsel relied upon many positions of law, which are believed to be fully answered in the following points for appellees.

I. That McNair's interest in the property, being an equity of redemption, was subject to be sold on judgment and execution at law.

The act of July, 1807, (Geyer's Dig., 266, sec. 63,) authorizes the sale of lands, tenements, and hereditaments. The 66th section of same law declares the effect of the sale when made; it is to pass "all the estate and interest which the defendant had in the property at the date of the judgment, and which he might lawfully convey."

As the language of this law is very comprehensive, and would certainly embrace interests in real property of every description, many authorities have been cited to show, first, that, by the common law, an equity of redemption was not subject to execution; second, that in the construction of statutes in countries where the common law prevailed, the words, "lands, tenements, and hereditaments," do not embrace equities of redemption in lands.

To these authorities we reply —

1st: That our statute was passed when the Spanish law was in force, and when lands subject to mortgage were liable to be sold for the payment of debts; and therefore, in the construction of the 63d section, the words, "lands, tenements, and hereditaments," will be held to embrace equities of redemption.— 4 Martin's Rep., 397; 3 Martin, 574.

2d: If the common law were the basis of our jurisprudence at the date of the act, still the 63d and 66th sections, taken together, show the purpose of the law-makers to be, to subject every interest in land to sale on execution, which the debtor could pass by his own conveyance. Whether, then, the Spanish or the common law be the system, the act subjects equities of redemption to sale on this process.

There was, when this act was passed, no distinction between legal and equitable estates, and no distinct jurisdiction over such different interests, and in such

case, as in Pennsylvania, 3 Binney, 8, the judgment would bind, and the execution would sell an equity of redemption.

Again: at the time of the sale, all property embraced by the term "real estate," were bound by a judgment, and consequently liable to sale.— Acts of 1822, p. 93, sec. 61; and an equity of redemption is embraced in these words.— 1 Caine's Cases, 47; 9 Cowen, 80.

II. In some of the United States the courts have held equities of redemption subject to sale on execution at law, by the construction of their legislative acts, while in others, a contrary construction has been given to similar acts; but in all cases, the acts seem to have had no stronger words than those in the 63d section of our law, and in no case approach, in strength, to words employed in the 66th section of that law.

As in New York — 1 Caine's Cases, 47; 4 Johns. Rep., 41; 7 *Ibid.*, 278; 11 *Ibid.*, 538; 19 *Ibid.*, 325; 5 Johns. Ch. Rep., 452, *cum multis aliis.*

So in Maryland — 9 Cranch, 456, 496; 5 Har. and Johns. 312.

So in Massachusetts — 1 Pick., 355; 1 Powell in note, (*a*) 254.

So in Connecticut — 1 Day, 193.

III. The equity of redemption may be sold, on judgment and execution, for the mortgage debt.— Tice *vs.* Annan, 2 Johns. Ch. Rep., 125.

The courts, in Tice *vs.* Annan, and in Atkins *vs.* Sawyer, 1 Pick., 355, state that there are difficulties in such sales; but it will be seen, on examination, that they are technical difficulties merely, and it will be seen, that these difficulties are to be met in different modes.— See 2 Blackford's Rep., 243, in which the court holds that the whole title passes upon such sale, free from the mortgage.  Apply the doctrine of merger as the remedy, and many of the difficulties disappear.— 2 Cow., 246.

IV. The mortgagee may be the purchaser at such sale.

The only objection made to his being the purchaser is, that he maintains a fiduciary relation to the mortgagor.   Many authorities have been cited to prove that the mortgagee is a trustee, and others to prove that a trustee cannot purchase the trust property.

It will be seen, on examination of these authorities, that the mere expressions used by courts, that the mortgagee is a trustee, never were designed to declare the relation between mortgagor and mortgagee to be that which subsists between a trustee for sale and he *cestui qui trust.*

It is most clear that no such relation exists between the mortgagee and the mortgaged property, as exists between the trustee for sale and the trust property; which relation prohibits a purchase by the trustee.

V. The evidence taken to show misconduct of Mullanphy at the sale, shows no misrepresentation of facts, no artifices, nothing but declarations which were true; and there is nothing to show that any advantage was gained by him.   On the contrary, the whole evidence shows that the whole property was not worth half the value of the incumbrances; and it is certain that no farther effort has been made to enforce the debts on McNair.

VI. A claim is set up to redeem by Mrs. McNair, as widow entitled to dower.

It does not appear when the marriage between Mrs. McNair and the complainant took place.

At the time of this sale, a sale on execution divested dower. (Geyer's Digest, title, "Dower.") This is independent of the fact that she executed the mortgage.

If the sale was valid at all, it passed her dower.


Scott, *Judge, delivered the opinion of the Court.*

This was a bill in chancery, filed by Margaret S. McNair, the widow and administratrix of Alexander McNair and the heirs of the said McNair, against the defendants, the executors and heirs, and devisees of John Mullanphy, deceased.

It is alleged in the bill, that Alexander McNair, being indebted to John Mullanphy, on the 26th day of January, 1820, executed to him his bond for the sum of $5,500, payable one year after date; and to secure the payment of the said sum, McNair and his wife executed to Mullanphy a mortgage in fee on the following described parcels of land and lot in the county and city of St. Louis, viz.: A lot of ground about six miles north of St. Louis, 2 arpens in front and forty in depth; also, a tract adjoining the last mentioned parcel on the north, seven arpens in front and forty in depth, both bounded on the east by the Mississippi river, and formerly owned by Antoine Morin; also, a lot in the city of St. Louis, on Main-street, 150 feet deep, bounded on the east by Main-street, and on the north by a lot formerly owned by Patrick Lee.

On the 30th November, 1820, McNair executed another bond to Mullanphy, in the penal sum of $1,000, conditioned for the payment of $500 one year after date. To secure the payment of this bond, the tracts of land above described were again mortgaged by a deed executed by McNair on the 16th December, 1820.

By a deed bearing date 17th April, 1821, McNair and wife mortgaged in fee to Mullanphy, for the purpose of securing the payment of another sum of $3,951, with interest, many other lots in the city of St. Louis and town of St. Charles, and lands in the counties of St. Louis and Jefferson.

Mullanphy, on the 18th day of August, 1823, commenced an action of debt against McNair, on the bond for the sum of $5,500, and recovered judgment against him on the 2d day of July, 1824. On this judgment, an execution was issued returnable to the October term, 1824, of the St. Louis Circuit Court, under which the sheriff seized all the property that was mortgaged, to secure the debt for which the judgment was rendered; and also all the property situate in St. Louis county and city, mortgaged on the 17th day of April, 1821, to secure the payment of the debt of $3,951. At the sale, Mullanphy became the purchaser of all the property included in both mortgages, for the sum of $2,700, except one lot, 38 feet wide and 120 feet deep, included and described in the last mortgage, which was purchased by Robert Rankin, for eighty dollars.

It is also alleged in the bill, that Mullanphy attended the sale in person, bid for each piece of property as it was offered, and, for the purpose of intimidating purchasers, and causing a ruinous sacrifice of it, in his own favor, proclaimed to

the bystanders that he had heavy incumbrances on all the property, and exposed to their view papers which he said were mortgages.

In consequence of such conduct, many persons were deterred from purchasing the property, and the same, with the exception aforesaid, was knocked down to Mullanphy.

After this sale, on the 13th December, 1824, Mullanphy filed his petition in the St. Louis Circuit Court, against McNair and his wife, to foreclose their equity of redemption to all the lands and lots included in the third or last mortgage, situate in St. Louis county. On this, such proceedings were had that a judgment was entered in these words: "That, if the said Alexander McNair, and Margaret S., his wife, do not well and truly pay, and satisfy, to the said John Mullanphy, or his legal representatives, the sum of five thousand five hundred and sixty-four dollars, and twenty-two cents, the debt and interest in the petition mentioned, with legal interest on the sum of three thousand nine hundred and fifty-one dollars, together with his costs and charges, on or before the third day of November next, (1825,) then the sheriff of St. Louis county is required and commanded to sell, on the said third day of November next, the mortgaged premises in the petition mentioned."

No steps have since been taken to carry into effect this judgment. The first two mortgages were never foreclosed, otherwise than by the sale above mentioned, after which Mullanphy took and retained possession of all the property he purchased at the sale, until his death, which occurred on the 18th day of September, 1833, having made a will, and appointed John O'Fallon one of his executors. McNair died on the 18th day of March, 1826. The bill charges that the mortgage debts have been paid, or might have been paid, out of the rents and profits of the land and lots purchased by Mullanphy, and prays for an account and permission to redeem.

Upon filing the bill, the judge of the St. Louis Circuit Court being a party to the cause, it was sent to the Court of Common Pleas.

Robert Rankin, who was made a party, admitted, in his answer, that he was present at the sale on the 6th October, 1824, and became the purchaser of a lot, as charged, for which he received a deed from the sheriff. He did not know that McNair set up any claim to the lot; that he purchased it in good faith, and has paid the purchase money. The answer of Rankin being excepted to, for not responding to that part of the bill in which oppressive conduct is charged against Mullanphy at the sale, and for not stating the value of the property sold, and the exceptions being sustained, he further answered, that he was at the sale; that Mullanphy was present, and proclaimed to the bystanders that whoever purchased any part of the property offered, would purchase a law-suit; that he held a mortgage on the property for a large amount; that when he, Rankin, bid for the lot he purchased, Mullanphy warned him not to bid, that he was buying a law-suit. He cannot state the value of the property purchased by Mullanphy, but his opinion then was, and still is, that Mullanphy obtained it for much less than its real value, and for much less than it would have sold for, but for his interference and threats.

The answer of the executor and heirs of Mullanphy to the bill, admits the recovery of the judgment on the bond for $5,500 on the 2d July, 1824; the award of the execution on the same on 20th August, returnable to the October Term, 1824; that, under said execution, on the 6th October, the sheriff sold all the property included in the two mortgages, except that in the counties of St. Charles and Jefferson, and that Mullanphy became the purchaser for $2,700 of all the same, save that he sold to Rankin; that, on the 16th October, the sheriff executed a deed to Mullanphy for the property purchased by him; that neither Mullanphy, before his death, nor his representatives since, have attempted any further to enforce said judgment. They know nothing of the conduct of Mullanphy at the sale: that, as to the mortgages mentioned in the bill, they supposed they were executed as they appear. They did not know when Mullanphy entered into possession of the property, or any part of it, or what rents he received. That they were at some expense in defending suits against part of the property, in which B. Ames and others, claiming the same by title paramount to McNair's, prevailed. To this answer, a replication was filed, and on the hearing, evidence in relation to the conduct of Mullanphy at the sale, and as to the value of the property, was introduced. The exhibits were also read in evidence. The court entered a decree dismissing the bill, from which the complainants appealed to this Court.

Many points were made in the argument of this cause, to all of which we shall not advert, deeming it unnecessary, but will confine ourselves to the most important, and those in which the merits of the cause are involved.

The first question made was, whether an equity of redemption could, before the revised laws of 1825, be sold on an execution at law? This question has been twice argued very elaborately in this Court, and it must be confessed, is not without its embarrassments. It may be admitted that, in England, there cannot be a sale of an equity of redemption upon a mortgage for a term of years; but if we consult the decisions of the American courts, authorities entitled to great respect are to be found in support of either side of the question, and this contrariety of views must, in a great measure, be attributed to the different lights in which a mortgage is viewed in courts of law and equity. The severe features of the ancient common law in relation to mortgages have been relaxed, and the opinion that a mortgage is a mere security for a debt has been steadily gaining ground in courts of law. This is the equity view of the subject, and Chancellor Kent remarks, that courts of law have, by a gradual and almost insensible progress, adopted the equity views of this subject, which are founded in justice, and accord with the true intent and inherent nature of every such transaction; and he continues, that in this country the rule has very extensively prevailed, that an equity of redemption was vendible, as real property, on an execution at law. In the case of The King vs. St. Michael's, Doug., Lord Mansfield declared, it would be an insult to common sense to say the mortgagor is not the real owner of the mortgaged property. Lord Hardwick, in the case of Cashborn vs. Inglis, 1 Atk., 603, said an equity of redemption had always been considered as an estate in the lands, for it might be devised, granted, or entailed with remainders, and such

entails and remainders might be barred by fine and recovery, and therefore it could not be considered as a mere right only, but must be taken to be such an estate whereof there might be a seizin : that the person, therefore, entitled to the equity of redemption, was considered as the owner of the land. A husband may be tenant by the courtesy of an equity of redemption. To perfect this right four things are necessary,—marriage, issue, death of the wife, and seizin in fact. As to the latter requisite, it is laid down, that an equity of redemption was not to be considered as a mere right only, but must be taken to be such an estate whereof there might be a seizin. The chancellor, in the case of Waters *vs.* Stewart, 1 Caines' Cases in Error, 47, holds that a mortgage is merely a lien, until it is foreclosed, or the possession acquired by the mortgagee ; that the mortgagor, until either of these events occur, is the beneficial owner ; he takes the rents and profits without any account ; he is a freeholder, qualified to vote as such ; and he is deemed the owner of a landed estate, within the English settlement laws. Judge Spencer, in the same case, remarks, that where a statute speaks of a seizin, an equitable seizin may be as well intended as a legal one, and the term is applicable to both. He could perceive no substantial objection to the sale of an equity of redemption under an execution at law. Chancellor Kent says, in the same case, if the mortgagor is to be regarded, as respects his own acts, and the acts of the world, the owner, subject only to the lien of the mortgagee, it is neither unreasonable nor improper that courts of law should treat the land as his, under the same limitations. There is no more inconvenience in subjecting the land to execution because there is a mortgage upon it, than there is where a prior judgment has bound it. The vendee, in both cases, will purchase subject to the lien, and he can calculate the value, deducting the incumbrance, as *correctly in* the one case as the other. In the case of Jackson *vs.* Parker, 9 Cowen, it was held, that one in possession of land under contract of purchase, has a real estate in the land which is bound by a judgment in a court of record, and that his interest might be sold under an execution at law. (Jackson *vs.* Scott, 18 J. R., 94.) In the case from Cowen, it was said, that possession was an interest in lands, subject to the lien of a judgment, and might be sold under an execution. The interest of a party in possession is not a mere equity, like the interest of a mortgagor out of possession. The cases above cited were decided in New York, in which State *lands, tenements, and real estate,* are subject to sale under execution. Real estate includes every possible interest in land, except a mere chattel interest. The term *estate* is very comprehensive, and signifies *the quantity of interest* which a person has, from absolute ownership, down to naked possession. It is the possession of lands which renders them valuable, and the quantity of interest is determined by the duration and extent of the right of possession. A mere equity cannot be sold, but an equitable interest, coupled with the possession, may be sold on execution. The interest of a mortgagor or mortgagee in possession is bound by a judgment, and may be sold, but out of possession, neither has an interest upon which the lien of a judgment can attach.— Jackson *vs.* Parker, *Ibid.*

The statute in force here, under which the sale now the subject of consideration took place, is in these words:—"All lands, tenements, and heriditaments

*whatsoever*, within this territory, where no sufficient personal estate can be found, shall be liable to be seized and sold, upon judgment and execution obtained." This act was passed in the year 1807. The act of January 11, 1822, made judgments a lien on the *real estate* of the person against whom they were rendered. It seems, that in subjecting real estate to the lien of a judgment, it was designed that it should be sold on execution, for the lien of a judgment may always·be enforced by execution. Then, if *real estate* could be sold under execution, our law was similar to that óf New York, under which the case of Waters *vs.* Stewart,·above cited, arose, in which it was held, that an equity of redemption might be sold by an execution at law.

It is a sound moral principle, that every species of property owned by a debtor should be subject to the payment of his just debts. At the date of the act above referred to, subjecting lands to sale under execution, nearly all the titles in the territory were equitable. The·fee was in the Government, and had passed to but few. There was no court of equity as contradistinguished to a court of law. Courts of equity were not organized until the year 1811. (Geyer's Digest, 105.) As considerable estates might be mortgaged for small debts, it would follow, if the equity of redemption could not be sold under execution, the creditors would be deprived of one of the resources for payment of their debts. There is no doubt, that by the common law, equitable interests in lands might be subjected to the payment of debts by suitable proceedings in a court of equity. The strife was, whether they should be liable to execution at law. Then, there being no court of equity here, as contradistinguished from a court of law, all equitable interests in lands would be freed from the payment of debts; an exemption we cannot think contemplated by the legislative power. In Pennsylvania, where law and equity are blended in their system of jurisprudence, and equity, as contradistinguished from law, is unknown, at least in the administration of justice, it is a well-settled principle that a judgment is a lien upon every kind of equitable· interest in land, and that such interests could be sold by execution at law. (Carkhuff *vs.* Anderson, 3 Bin., 8.) Such seems to have been the system of jurisprudence in this territory from 1804 to 1811; and if, during that time, equitable estates might be sold under execution, and the terms, "lands, tenements, and hereditaments," comprehended such interests, the mere creation of a court of equity afterwards would not restrain their signification to legal estates only.

Again: The 66th section of the act concerning judicial proceedings, (Geyer's Digest, 267,) in force at the time of the sale now under discussion, directed, that the sheriff, after a sale on execution, should give the buyer a deed, duly executed and acknowledged in court, for what is sold, which deed shall recite the execution, purchase, and consideration, and shall be effectual for passing to the purchaser all the *estate and interest* which the debtor *had*, or might lawfully *part with*, in the lands, at the time the judgment was obtained. If all the estate and interest which the debtor could part with passed by the sheriff's deed, then all his interest and estate were sold; for surely it was not the intention of the legislative power that the purchaser should have a deed for more than he

purchased,—that he should take an interest for which he paid no consideration. The section which directs that lands, tenements, and hereditaments may be sold under execution, should be taken together with that prescribing the effect of the sheriff's deed, without regard to the order in which they stand, and their joint signification is, that all the estate and interest of a debtor, in lands, tenements, and hereditaments, which he may lawfully part with, shall be sold under execution. It may be said that the terms, *estate* and *interest*, mean legal, and not equitable, estates. We have before observed, that at the date of the act now under consideration, almost all the titles in this territory were equitable, in the common law sense of that term. But, independently of this consideration, on what principle are these terms to be held applicable only to legal estates? If a word, or term, by itself, includes several species or kinds, each of which can only be designated by a descriptive epithet, if that word, or term, is used without an epithet, showing that a particular species or kind was intended, then it is to be understood as comprehending all the varieties included in it. This is the natural construction of language. In the case of Waters *vs.* Stewart, before cited, we have seen that Judge Spencer held, that when a statute speaks of a seizin, an equitable seizin may as well be intended as a legal one. The term is applicable to both. To the same effect, Chancellor Kent, in the same case, remarks, "The word seizin, in a statute, is frequently construed to apply to an equitable, as well as a strict legal seizin." The application is always according to the subject-matter, and to give the statute complete effect. Now, what was there then in existence to limit the construction of the terms, *estates* and *interests*, to mere legal titles? These words were introduced in the year 1807, before the organization of a court of equity, and at the time of their introduction it was necessary to construe them as including equitable estates, in order to effect the intention of the law-makers, which was, to subject all lands, tenements, and hereditaments whatsoever, to *sale* on execution; and having this signification when first placed on the statute-book, neither the organization of a court of equity afterwards, nor the introduction of the common law, would restrain their import.

The next question we shall examine is, whether a mortgagee could institute a suit at law *to recover the debt* secured by the mortgage, take out execution, and sell the equity of redemption of the property mortgaged to secure the debt for which suit was brought?

In an examination of the books, cases are found in which such proceedings have been tolerated. I say "tolerated," for no case can be produced in which the question between the mortgagor and mortgagee arose, that has received the unhesitating sanction of a court. The confusion and embarrassment consequent upon such a step would disincline any court to give it its countenance. What is the sense of the thing, when the mortgagee, under execution, sells the equity of redemption of the property mortgaged to satisfy the debt? It is an admission that it is worth something over and above the mortgage debt. If not, why sell? What object can the mortgagee have, unless it is to unite the legal and equitable estates, and thereby defeat a redemption? If the mere equity of redemption is

sold, that is, the mortgagor's interest, after satisfaction of the mortgage debt, and the mortgagee becomes the purchaser, whatever sum he pays for the equity of redemption will belong to the mortgagor; for, as the mere equity is sold, he, by becoming purchaser, admits the mortgaged property is worth more than his deb', by the sum bid, and consequently, the debt is extinguished, and the sum bid will belong to the mortgagor. So, in fact, it is nothing but a new mode of foreclosure. But suppose a third person becomes the purchaser, (and it is a singular kind of auction where but one particular person can become a purchaser,) what is the consequence? Say, that he bids the amount of the mortgage debt; that amount is paid by the sheriff to the mortgagee; his debt is thereby satisfied, and the purchaser holds the property freed from the mortgage debt; and although he has bid the amount of the mortgage debt over and above it, yet the mortgagor receives nothing, and his equity is entirely sacrificed. To make this matter plain, let us suppose a case. A. has a debt of $500, secured by mortgage on property worth $1,000; he sues at law for his debt, takes out execution, and levies it on the equity of redemption of the mortgaged property: at the sale, B. becomes the purchaser for $500; that is, B. is willing to pay $500 for the property, after paying the mortgage debt; the sheriff takes B.'s $500, hands it over to A.: A.'s debt is thus paid; the mortgage is extinguished, and B. takes the land, freed from the mortgage debt, and so, in fact, gets it for $500, when he bid $1,000; so the equity of redemption is sacrificed, and the mortgagor loses $500. The same consequences ensue, though not to a like extent, when a purchaser bids less for the equity of redemption than the debt. The case of Tice *vs.* Annan, (2 J. C. Rep.,) would remedy this, by compelling the mortgagee to assign his debt and mortgage to the mortgagor, and thereby substitute him for the mortgagee, by which he can compel the purchaser to pay him the amount of the mortgage debt. But that very case shows there are circumstances under which this cannot be done, and so the mortgagor will be remediless. I do not consider the case of Tice and Annan as warranting such a mode of procedure. In the case of Jackson *vs.* Hull, (10 Johns. Rep.,) the question did not arise, for it was a controversy between the mortgagee and the purchaser of the equity of redemption. It was held, in the case of Youse *vs.* McCreary, (2 Blackford,) that by such a manner of proceeding, the mortgage was waived, and it was likened to a foreclosure, as the whole estate was deemed to have been sold. The case of Lyster *vs.* Holland, (1 Ves., jun.,) decided by Lord Thurlow, contains something in relation to this subject; and although that cause went off on another point, yet the propriety of such a proceeding was very much doubted by the chancellor. "Was there," says he, "ever an instance of such a proceeding as this? It was a new case to him, that this case obtains in mortgages."

But we will not rest our opinion on the opinion on the considerations above stated. The cases above cited all occurred where there were no statutory provisions on the subject of the foreclosure of mortgages, especially provisions of a character beneficial to the mortgagor, and which guarded and protected his equity of redemption against too speedy a foreclosure. Hence, in those States where

such provisions obtain, it has been held that such sales are void. In Massachusetts, where the effect of such a course of procedure was, to reduce the length of time to which the mortgagor was entitled, to redeem, the sale was declared inoperative. In the case of Atkins *vs.* Sawyer, 1 Pick., where a mortgagee had caused a sale to be made of the equity of redemption on execution, for the purpose of paying the debt secured by the mortgage, the court said, if the sale of the equity be operative, its operation will be repugnant to the statute regulating the foreclosure of mortgages ; it enables a mortgagee, at his will and pleasure, to reduce the mortgagor's right of redemption from three years to one, thus depriving him of an important advantage secured to him by the statute. In Kentucky, where similar statutory provisions prevail, the like doctrine obtains.—7 Dana, Goring *vs.* Shrieve.

The statute of 1807, concerning the foreclosure of mortgages in force when the sale took place, which is now the subject of consideration, conferred on the mortgagor rights of some importance, of which he was deprived by selling his equity of redemption, at the suit of the mortgagee, for the mortgage debt. That statute, in proceedings to foreclose, required twenty days' service of process before the return day, whereas, in ordinary proceedings at law, service fifteen days before the return term was sufficient. Moreover, the statute directed that the sale of the mortgaged premises should be at least nine months from the commencement of the process of foreclosure. The statute, in declaring that the sale should be postponed at least nine months from the commencement of the suit, did not intend that that should be the precise period at which the sale should take place, but from the manner in which it is worded, it is clear that the court had a discretion, and might, and, no doubt, would, upon showing sufficient cause, extend the time. All that was required was, that the sale should not take place in less than nine months ; if that time was prolonged by the court, there was nothing in the statute to prevent it. In proceedings to foreclose mortgages in England, nothing was more usual than to extend, from time to time, the right to redeem. In the ordinary course of proceedings, lands might be sold in less than nine months, and this actually occurred in this cause. The method of procedure adopted by the mortgagee deprived the mortgagor of advantages secured to him by law; we are therefore of the opinion the sale was void.

The determination of this point establishes the right to redeem the land included in the first mortgage. It remains to be ascertained whether the complainants have a right to redeem that included in the third. It seems strange that we should be called upon to decide this question, when there is a solemn admission by Mullanphy that this right exists.

There is a decree of foreclosure in evidence, that unless A. McNair pay to John Mullanphy the sum of $5,564 22, on or before the 3d day of November, 1825, that the mortgaged premises be sold. Mullanphy, before his death, nor the defendants since, have carried this decree into effect; it is unreversed, and is still binding ; and is a solemn admission of McNair's right of redemption. That judgment or decree is an estoppel, and the defendants are precluded from deny-

ing its justice and validity.   In the case of Offutt *vs.* John, decided at this term of the court, after a review of all the authorities, it was held, that to make a judgment a bar, in cases where an attempt is made to litigate a second time a matter in which a court of competent jurisdiction had pronounced its sentence, it was not requisite to plead the former judgment in order to make it an estoppel, but it is sufficient if it was given in evidence, and that its force and conclusiveness were the same when given in evidence as when pleaded.   And we are gratified to state, that the conclusion to which the court came in that case meets with the concurrence of Professor Greenleaf, a jurist whose learning and abilities have everywhere commanded the respect and admiration of the profession. (Greenleaf's Evidence, 567.)   But had it been determined otherwise, the rule requiring a judgment to be pleaded, in order to constitute an estoppel, was never extended to cases in which the party relying on the judgment was precluded, by the form of proceeding, from pleading it.   If he is denied that opportunity by the mode of procedure, he may show it in evidence, and it will in general have the same effect as pleaded.— Howard *vs.* Mitchell, 14 Mass. Rep.;   Starkie, vol. 1.

The determination of the two last points settles this controversy, so far as the representatives of Mullanphy are concerned.   To what extent, and in what manner, O'Fallon and Rankin may be affected, we give no opinion, nor, in alluding to them, do we mean to intimate that they will be effected by the decree which will be pronounced in this cause.   We have mentioned them merely, that it might not be supposed they were overlooked.   Nothing having been said in the argument in relation to the liability of the property held by them to redemption, we have deemed it most advisable to suffer that question to be determined in the court to which the cause will be remanded.

Decree reversed, and cause remanded.

TOMPKINS, J., *dissenting*.