### ANDREW D. COOK *v.* ANDREW C. GRAY.

The obligation of a recognizance of special bail entered into when the statute then in force in relation to writs of *capias ad satisfaciendum*, provided that none should in any case be issued upon a judgment recovered by a person not residing within the State, without an affidavit of fraud against the defendant, is not impaired by a subsequent statute repealing that provision and dispensing with the affidavit of fraud in such cases.

There is a manifest and well established distinction between the obligation of a contract and the remedy in a court of law upon the contract. The former the legislature has no power to impair; but the latter may be modified and regulated by the legislature at its pleasure in relation to past, as well as future contracts.

The affidavit of fraud required by the repealed statute, was as much a part of the remedy on the judgment, as the writ of *capias ad satisfaciendum* upon it, which it was required to precede, was in such a case; and as the subsequent and repealing statute did not touch or impair the obligation of the contract, but merely modified the remedy upon it, it is not unconstitutional in respect to it.

The general rule that the construction of a statute is not to be such as to give it a retrospective, but on the contrary, a prospective operation, does not apply to a repealing statute without any saving in it.

THIS cause came up on a case stated and questions of law reserved for a hearing before all the Judges of the Court of Errors and Appeals at the last term and was held under advisement by them until the present, when their opinion was delivered.

By the written case as stated, it appeared that a writ of *capias* in an action on the case at the suit of Andrew D. Cook, the plaintiff, against George Goss and John Mc-Ginniss trading as the firm of Goss & McGinniss, was issued on the 12th day of July, 1856, returnable to the November Term of that year in the Superior Court for New Castle County, and that Andrew C. Gray, the defendant, became special bail for George Goss in it, John McGinniss, the other partner, having been returned to the writ *non est inventus*. The recognizance of bail was entered into by him on the 10th day of September, 1857. The action proceeded to issue and on the 28th day of November, 1859, judgment was confessed in it by Goss, the defendant, for $5,551. Upon the 14th day of March, 1860, a writ of *capias ad satisfaciendum* was issued on the judgment against Goss and delivered to the sheriff of the county returnable at the ensuing May Term of the court, when it was returned *non est inventus*. But no affidavit of fraud had been filed in the case previous to the issuing of the last mentioned writ, pursuant to the provisions of section 52 of chapter 111 of the Revised Statutes of the State, which among other things provided that no such writ should in any case be issued upon a judgment at the suit of a person not at the time such judgment was recovered residing within the State, without an oath or affirmation first made and filed in the office of the prothonotary, that the defendant in the judgment was justly indebted to the plaintiff in it in a sum exceeding fifty dollars and that he verily believed the defendant had disposed of his property to the value of more than that sum, with the intent to defraud his creditors. And that neither Cook nor Goss had ever been citizens of, or resident in the State.

It was thereupon agreed that if the court should be of opinion upon the fact stated that the said last mentioned writ was lawfully issued, the judgment should be for the plaintiff, the amount of it to be ascertained by the prothonotary, but if otherwise, then for the defendant.

The action in the case stated was on a *scire facias* at the suit of Cook, the plaintiff, on the recognizance of bail in the action before mentioned, against Gray, the defendant.

*Patterson,* for the plaintiff: The question in the case depended mainly on the statute passed since the revision of our statutes at large, passed at Dover, February 21, 1859, 11 *Vol. Del. Laws* 694, which repealed the last six lines of the pre-existing provision referred to in the case stated. Under that provision thus repealed, no writ of *capias ad satisfaciendum* could issue upon a judgment in this State by a non-resident without an affidavit filed by him alleging fraud in the mode indicated against the defendant; but since the repeal of that portion by the subsequent act referred to, no such prohibition or restriction now existed, and the law in regard to the matter, was consequently left just where it stood before the passage of the previous statute on which the defendant relied. The repealing act referred to was not invalid on the ground of unconstitutionality, or otherwise. Because it was not an *ex post facto* law within the meaning of that term, in its application to the present case, although it was not enacted until after the recognizance of bail on which this action was founded, had been entered into by the defendant. 3 *Sto. on Cons. sec.* 1345. *Calder v. Bull,* 3 *Dal.* 386. *Fletcher v. Peek,* 6 *Cranch* 138. *Ogden v. Saunders,* 12 *Wheat,* 206, 303, 329, 330, 335. *Watson et. al v. Mercer,* 8 *Pet.* 88. Nor because of its being retrospective in its application and operation, for judgment having been obtained against Goss, which *ipso facto* fixed the liability of his bail, neither of them had any vested right to have any particular process adhered to as preliminary to the plaintiff's availing himself of his legal remedies upon it. Any vested right appertaining to the case, rightfully belonged to the plaintiff to have any statutory impediments superimposed upon his common laws rights removed; and neither the Federal, nor State constitution prohibits the

58

legislature from passing retrospective laws generally. *Watson v. Mercer*, 8 *Pet.* 110. *Bennett v. Boggs.* 1 *Bald.* 74. *Satterlee v. Mathewson*, 2 *Pet.* 414. Even the Supreme Court of the United States cannot pronounce an act of a State legislature void as contrary to the federal constitution, merely because such an act divests vested rights of property. *Warren Bridge Case*, 11 *Pet.* 420. But the court will not declare a law to be unconstitutional, unless the conflict between it and the constitution is clear and palpable, and the presumption is always in favor of the validity of it. *Cooper v. Tellfair*, 4 *Dal.* 14. *Ex parte Mc Clelland*, 1 *Cow.* 550. 3 *Dal.* 386. 6 *Cranch* 87. 3 *Pet.* 447. 2 *Dal.* 309. 7 *Gill and Johns.* 7. 19 *Johns.* 58. 2 *Pet.* 522. 4 *Greenl.* 140. 6 *Ibd.* 412. It could not be contended that the repealing act in question impaired or affected the obligation of any contract with Goss, or with his bail, the defendant, but it related to and affected only the remedy or judicial process on the judgment by way of executing and collecting it, and when such was the case, it did not in contemplation of law and in the purview of the provision of the constitution of the United States on the subject, touch or effect, much less impair the obligation of the contract. 2 *Sto. on Cons. secs.* 1376, 1390. *Tharpley v. Hamer*, 9 *S. and M.* 310. *Stocking v. Hunt*, 3 *Denio* 274. *Mason v. Haile*, 12 *Wheat.* 370. *Bruce v. Schyler*, 4 *Gilm.* 221. 4 *Watts and Sergt.* 218. 1 *McLean* 35. 5 *How.* (*Miss.*) 285. And there was no doubt that in a general sense, the mode of process constitutes a part of the remedy. *Sto. on Conft. of Laws, sec.* 568.

But could a process which would be legal and valid against Goss, the defendant in the judgment, be illegal and invalid against the special bail, the defendant in this action? Or in other words, could the repealing act be constitutional and operative against Goss and at the same time unconstitutional and inoperative against Gray? The power of the legislature to interfere with vested rights, was it seemed unlimited, subject only to the restrictions to be found in the federal and state constitutions. *Butler*

*v. Palmer*, 1 *Hill* 324. *The People ex rel. Israel v. Tibbtz*, 4 *Cow.* 384, 392. *Cochrane v. Van Sorlay*, 20 *Wend.* 526. *The People v. Livingston*, 6 *Wend.* 526. *Mayor of New York v. Miln*, 11 *Pet.* 103. *Suydam and Boyd v. Broadnax*, 14 *Pet.* 67. 10 *How.* 395. 3 *Wash.* 313. But was there any vested right in, or any contract in this case with the special bail divested or impaired by the exercise of the sovereign and legislative power of the State in question? And what is the nature of the undertaking of special bail? Is it a contract within the purview of the constitution? A *sci. fa. sur. recognizance* is a judicial writ to have execution upon a debt of record. *Cresman v. People*, 3 *Gilm.* 351. *Beers et al. v. Haughton*, 9 *Pet.* 329. But a statutory bond taken in a proceeding like this, was not a private contract, but rather a statutory engagement. *Mason v. Haile*, 12 *Wheat*, 370. Had Goss been surrendered by his bail in this case, would the court have ordered his discharge on the ground of the passage of the act in question after the recognizance of bail had been taken? Certainly not; and if not, how then could the bail be discharged on that ground? For the doctrine was now clearly established that when the principal would be entitled to an immediate and unconditional discharge, if he had been surrendered, the bail will be entitled to relief by entering an *exoneretur* without any surrender. *Beers et al. v. Houghton* 9 *Pet.* 358. *Conely v. Griffen*, 3 *Harr.* 333. A ground that would not be sufficient for the exoneration of the principal, ought not to serve to exonerate the bail, more especially where it arose from the act of a superior power without the procurement, connivance, or consent of the plaintiff in the action.

*D. M. Bates*, for the defendant: Under the recognizance of bail and the law then in force, he denied that the bail was liable, without an affidavit of fraud had been filed against the principal before the *ca. sa.* was issued against him, unless the repealing act of 1859 changed the obligation of the bail, which it could not do under article 1,

section 10 of the constitution of the United States, inasmuch as it would impair the obligation of his contract. Before the act of repeal was passed, the bail was only qualifiedly liable; but after its passage, if it was subject to it, his obligation at once became unqualified and absolute. And that could not be done under the provision of the constitution before referred to. To change the obligation of a contract in any manner by adding to, or increasing it on the one side, or by removing, or diminishing the reciprocal obligation of the other party, was just as much an infraction of that provision of the constitution and an impairing of the obligation of it, as the unmaking, or the entire abrogation of the contract itself could be. 2 *Sto. on Cons. secs.* 1378, 1385. 3 *Wash.* 214, 257, 281, 302. *Sturges v. Crowninshield*, 4 *Wheat.* 122, 197. *Ogden v. Saunders*, 12 *Wheat.* 214, 257, 281, 302. *Camfrange v. Burnell*, 4 *Wheat.* 340. *Bronson v. Kinzie*, 1 *How.* 311. *McCracken v. Heyward*, 2 *How.* 608.

The obligation of a contract did not spring alone from the terms of it, but from those terms and the law as it existed at the time of the making of the contract in regard to the subject matter of it. Certain contracts contain in the express terms of them all that is to be done under them, as for instance, a bond for the payment of a sum of money simply. But there were many contracts, and classes of contracts in regard to which this could not be said, because they necessarily import and imply terms not expressed in them, and which may not even be apprehended by the parties at the time of entering into them, but which nevertheless are essential to the force, obligation and effect of them and which the law by implication incorporates in them, such as promissory notes, mortgages, and if he were called upon to suggest an especially apt illustration of one of the latter class, he would particularly mention a recognizance of bail. In the first class to which he had alluded the contract in terms contains no stipulation for days of grace, protest, or notice of non-payment after it, and yet in such cases, these

by operation of law become a part of the contract and enter into and constitute as much the obligation of it, as if they were in express terms embodied in it. And this was altogether independent of and distinct from the matter of the remedy on the contract, which he admitted the legislature might modify at its pleasure, without affecting or impairing the obligation of it. The cases which he had already cited not only distinctly recognize this principle, but would serve to show quite as clearly the manifest distinction on that point.

As to a recognizance of special bail, the obligation of the contract and the liabilities of the bail depended less on the terms of the instrument than upon the rules of the court in which it was taken and the principles of law applicable to it. *Beers v. Houghton*, 9 *Pet.* 356. If the requirement alluded to in the repealed provision of the statute which was in force when the recognizance of bail in this case was taken, constituted a condition of it in effect, then it was a qualified one, which the repeal of that provision afterward converted into an absolute and unqualified condition. But what is the nature of the obligation, or liability of special bail? He is not a surety for the principal, nor is his obligation simply to pay the money sued for in case the principal fails to do so; but his obligation is primarily to produce his body in case he fails to satisfy the judgment, or voluntarily surrender himself into the custody of the law therefor, and therefore his obligation as special bail does not and cannot arise and has no practical effect until a *ca. sa.* has issued against the principal, and whatever discharges the principal from that, will entitle his special bail to an exoneration from the obligation of the recognizance. This is the primary obligation of the bail under the recognizance, and whatever qualifies this, qualifies his obligation as such, and whatever changes it, changes, and of course, impairs in the sense and meaning of the constitution, the obligation of his undertaking and engagement under it. *Beers v. Houghton*, 9 *Pet.* 356. 1 *Tidd. Pr.* 354. 9 *Wend.* 462.

The *ca. sa.* is issued merely to fix the liability of the bail, and is not a remedy upon the contract, or recognizance of the bail. The *ca. sa.* against the principal is therefore what determines and fixes the obligation of the bail; but it is not a remedy on the recognizance of the bail, because it must precede the determination of his liability upon it, and has no characteristic, or property whatever of a remedy upon his contract; because there can be no breach of the recognizance on his part until after the *ca. sa.* is issued against the principal and he has failed to be forthcomiug in response to it. When we speak of legal remedies, or a remedy at law, upon a contract in contradistinction to the legal obligation of it, although the one cannot exist without the other, it yet always imports legal process upon the contract itself to enforce the obligation of it because of the breach of it. There was therefore no reason for the contention that this case fell within the principle recognized in the cases cited on the other side, all of which related to the remedy upon and not to the obligation of the contract. To give such an operation therefore to the repealing act in question as had been contended for on the other side, would be to render it retrospective as to the obligation of it and not as to the remedy upon the recognizance of bail in the present case, which would have the effect even upon the authority of those cases, to render it, so far as this case was concerned, unconstitutional, inoperative and void. But is there after all, anything in the act in question to require the court to so construe it as to give it a retroactive operation? Was there anything in the terms of it which indicated that the legislature contemplated or intended that it should have any other effect or operation than such as usually attended upon the enactment of statutes by it, that is to say, that they are to have the force and effect of public laws from the date of their passage only, unless a clear and evident intention appears to the contrary; and unless it does so appear, the court will in no case give such a construction to a statute as to

impart to it any retrospective operation, or effect what-ever. *Sedw. on Cons. and Stat. Law* 132.  2 *Show.* 17.  2 *Mod.* 310.  4 *Burr.* 2460.  *Moore v. Duslen,* 2 *Exch.* 22.  *Dash v. Vankleck,* 7 *Johns.* 477.  *Johnson v. Burnill,* 2 *Hill* 238.  *The People v. Curnal,* 2 *Seld.* 463.  *Boyd v. Barringer,* 23 *Miss.* 421.  *Plumb v. Sawyer,* 21 *Conn.* 351.  *Duffiel v. Smith et al.,* 2 *Serg. and Rawle* 590.  *Bedford v. Skilling et al.,* 4 *Serg. & Rawle,* 401.  *Hasting v. Lane,* 15 *Maine* 134.  5 *Bac. Abr.* 836.  1 *Black. Com.* 46.

*Comegys,* for the same: If the repealing act in this case was to be considered as affecting the remedy only and the legislature may *ad libitum* interfere with and modify the remedy on the ground that it does not impair the obligation of the contract, or the recognizance of bail in this instance, then it would be perfectly competent for it to enact that the obligation of bail should become fixed and absolute on the recovery of judgment against the principal, without any *ca. sa.* whatever.  But would that be in consonance with the undertaking and engagement of the bail, which was in the alternative, or originally conditional in its character only, that if the principal, the defendant in the suit, on the recovery of the judgment against him, did not surrender his body on such a writ being sued out against him, or the bail did not thereupon do it himself, then and in that event the latter should be liable for the amount so recovered against him?  For such was the original condition and such was the original and only obligation of the bail in the recognizance; and although it might not have been embodied in exactly so many words, yet in contemplation of law and in point of fact it was as distinctly understood and implied in it, as if it had been inserted in it in so many express words, for the law made it a part of the recognizance. Well, if the unwritten, or common law made this a part of the obligation thus assumed by him, did not the express provision of the written law, or statute then existing and in force on the subject, equally make it at that time

one of the essential and necessarily implied terms and conditions which must precede the absolute completion and fixation of his obligation and undertaking under it, that there should also be an affidavit of fraud filed by the plaintiff in the suit, or some one for him such as the law then required in such a case, before the plaintiff should be allowed to sue out such a writ in order thus to fix and complete the obligation and liability of the bail for the debt? Were not therefore both of these precedent terms and conditions—and the latter quite as much as the former,—necessarily implied and understood, and by the law made most material and substantial parts of the contract of bail in this case, and effect and qualify in a most essential respect, if they do not in fact, constitute and compose his sole obligation under it? And was it then in the power of the legislature by any act which it could pass, to abrogate and abolish both, or either of these precedent terms and conditions, as well understood and implied, as if they had been expressly embodied in the contract at the time, without impairing the obligation of it, and making another and entirely different contract out of it? If so, he was at a loss to comprehend it.

It so happened in this case, that this very provision of the statute which it was now contended on the other side, was without prejudice or detriment in contemplation of law to the defendant in the present action, and did not impair or in any manner affect the obligation of his contract under the recognizance, constituted the chief consideration at the time which induced him to enter into it. Neither of the parties, the plaintiff, or defendant, in that suit, were citizens of, or resided in this State; but the defendant in that suit was well known to the defendant in this action, as a gentleman of high character and unimpeachable integrity, and as he had every reason to believe that no such affidavit of fraud, as the law then required and we insist still requires, could ever be filed against him, he, of course, had no hesitation, because he apprehended no danger, in entering into the recognizance

as his special bail in that action. The case therefore addressed itself to his counsel, if not to the court, as one of more than ordinary interest and hardship under the particular circumstances which had attended it.

*J. A. Bayard,* for the plaintiff: At common law and by the course of the courts in England, the *ca. sa.* is issued, not for the purpose of arresting the principal, for it might lie in the office of the sheriff four days and then be returned, without any search for, or effort made to arrest him, but for the purpose only of enforcing the liability of the bail. It was no part of the condition, and was not one of the terms of the contract, that a *ca. sa.* should be issued, or the bail would be discharged. It was only by the practice of the courts there that a *ca. sa.* in such case was issued and became necessary, and our statute had followed it. But to show that it constitutes no part of the condition, or of the terms of the contract, but has relation merely to the remedy upon it, it was only necessary to remark that the obligation of the recognizance is not discharged, even if no *ca. sa.* is issued on the judgment against the principal, and it was only necessary when the plaintiff is about to proceed to his remedy against the bail for the debt. Besides, the *ca. sa.* is not against the bail, but it is against the principal and the defendant in the judgment, and being a writ of execution on the judgment, what possible pretext could there be for saying that it does not relate to the remedy, but is by implication of law and the intendment of the parties, one of the terms and a part of the condition of the contract of bail? The acts in question, both the repealing and the repealed act, merely affected the remedial proceeding at law against the bail, but it had nothing to do with the contract itself, or the terms, conditions, or obligation of it. And this as a matter which merely pertains and relates to the remedy, or to a proceeding preparatory to the enforcement of it, does not at all depend upon the liability of the bail as either expressed or implied in the recognizance,

or any part of the contract, but upon the provisions of the law and the rules of the court in regard to the matter; and which, inasmuch as they pertain and relate to the remedy exclusively, may be varied, or modified at any time by the power which creates and prescribes them. And therefore it was that Justice Story remarked in the case of *Beers v. Haughton*, 9 *Pet.* 356, that the recognizance of special bail being part of the proceedings in a suit, and subject to the regulation of the court, the nature, extent and limitations of the responsibility created thereby were to be decided, not by a mere examination of the terms of the instrument, but by a reference to the known rules of the court and the principles of law applicable thereto. Whatever in the sense of those rules and principles will constitute a discharge of the liability of the special bail, must be deemed included within the purview of the instrument as much as if it had been expressly stated in it.

As to the point made on the other side that in the construction of a statute it was never to receive such as would give it a retrospective operation, unless it was expressly provided in it, or it was clear and evident in it that it was intended to have such effect, he would simply say that in the case then before the court, the judgment on which the *ca. sa.* was issued was not recovered until after the repealing statute in question was enacted, and relates only to judgments recovered by non-residents, with or without special bail, and to writs of *ca. sa.* thereon, but without a word about special bail. What reason could there then be for such an objection, since it had no retroactive operation whatever with reference to that judgment?

*Gilpin, C. J.*, announced the opinion of the court: This case comes up on a case stated and questions reserved for hearing before all the Judges.

It appears from the record that the plaintiff, Andrew D. Cook, instituted suit against one George Goss on the

12th of July, 1856, that Andrew C. Gray became the special bail of Goss on the 10th of September, 1857, and that judgment was recovered against the latter on the 23d of November, 1859.

On the 14th of March, 1860, a writ of *ca. sa.* was sued out against Goss returnable to the next May term, which, in due course, was returned by the sheriff *non est inventus.* Both Cook and Goss were non-residents of this State, at the time the judgment was recovered.

A writ of *scire facias* was sued out against Andrew C. Gray, as special bail, on the 10th of June, 1860, returnable to the November term following.

At the time Mr. Gray became special bail, the fifty-second section of chapter one hundred and eleven of the revised statutes of this State, was in full force.

By the concluding paragraph of this section, it is declared that no writ of *capias ad satisfaciendum,* shall, in any case, be issued upon a judgment at the suit of a person not at the time such judgment is recovered residing within this State, without an affidavit of fraud first made and filed as therein before is specially provided. Afterward, on the 21st of February, 1859, for reasons not generally understood, the legislature was induced to repeal the said concluding paragraph of section fifty-two. This was done after the entering of special bail, and before the recovery of judgment against Goss. The repealing act contains no saving, as to pending suits; it merely declares " that the concluding paragraph, being the last six lines of section fifty-two of chapter one hundred and eleven of the revised statutes of the State of Delaware be, and the same hereby is stricken out, and repealed."

No affidavit of fraud was made and filed by the plaintiff prior to the issuing of the writ of *capias ad satisfaciendum ;* and this circumstance, in connection with the construction to be given to the act of the legislature of the 21st of February, 1859, has given rise to the controversy in this suit,—a controversy, involving a consideration of the power of a state to change or modify, by legislation,

the remedies given by the existing law, for the enforcement of contracts.

Upon this state of facts two questions have been submitted for our decision. First, Whether the repealing statute of the 21st of February, 1859, impairs the obligation of the contract entered into by the defendant, as special bail? Second, Whether the said repealing statute should be so construed as to give to it a retrospective operation? Both of these questions have been very elaborately and ably argued by counsel on both sides; and most of the authorities, having a bearing upon the subject have been brought to our attention. We propose to consider these questions in the order in which they have been presented. In regard to the first, it may be proper to observe generally, that a distinction is taken in the books, between a contract, and the obligation of a contract. Indeed, the distinction seems so manifest from the very terms of the constitution, as to require no aid from judicial interpretation or authority to support it. A contract is defined to be a compact between two or more persons; or, an agreement to do, or not to do, a particular thing. It matters not whether the contract be executed or executory,—expressed in terms, or implied by law. It may in form be a grant, which, in effect, is a contract, but a contract executed, the obligation of which continues to exist for its protection. The constitution makes no discrimination whatever, between different kinds or classes of contracts. By its terms and its spirit, it comprehends and takes under its protection all that are valid of every description.

The obligation of a contract, that is to say, the civil obligation, for this alone as distinguished from the merely moral obligation, is intended to be protected by the constitution, is that law which binds a party to perform his undertaking; and it consists in the effective force of the law which applies to, and compels performance of the contract, or a compensatory equivalent in the way of damages for non-performance. It is not in the contract

itself, that the obligation as an inherent quality, can properly be said to reside, but in the law of the contract.

The broad and unqalified doctrine, that the existing laws of a state enter into, and form an essential part of the contract, would, it seems, if carried out to its logical results, operate most injuriously in restraint of the legislative power of the states over subjects hitherto considered as being clearly within their legitimate jurisdiction. Do all the laws of the state, enter into and form part of the contract? If not all, then what portion of them? and where are we to draw the line of discrimination between those that enter into the contract, as one of its conditions or stipulations, and those which do not? This, at least, is certain,—the doctrine that the law of the remedy enters into the contract, finds no sanction in the decisions of Chief Justice Marshall, or the other great Judges of his day; and the only decisions which seem to give countenance to such a doctrine, are of comparative modern origin, and claim a different paternity. It would appear, therefore, to be the part of wisdom to adhere to the old doctrine, that, whilst the laws of a state where a contract is made, determine its validity, construction, and obligation, they do not in fact enter into and become an essential part of the contract itself.

The distinction between the obligation of a contract, and the remedy for its enforcement, ought to be considered as well established. It was first authoritatively settled in the year 1819, in the case of *Sturgis v. Crowninshield*, 4 *Wheaton*, 122. Chief Justice Marshall, who delivered the decision of the court in that case, says, that "the distinction is founded in the nature of things, and that without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the legislature shall direct." And this doctrine, has been recognized and affirmed, by a long series of decisions, from that day to this.

In the case of the *Charles River Bridge v. Warren Bridge et al.*, 11 *Peters* 581, Mr. Justice McLean declares, "that

after a careful examination of the questions adjudged by the Supreme Court they seem not to have decided, in any case, that the contract is impaired within the meaning of the federal constitution, where the action of the state has not been on the contract." Even as late as the case of *Butler et al. v. Pennsylvania,* reported in 10 *Howard* 416, the Supreme Court say, that the contracts designed to be protected by the tenth section of the first article of the constitution of the United States, are " contracts by which perfect rights—certain, definite, fixed private rights of property, are vested." What vested right, what property, can a party have in a mere remedy ? The same distinction between the obligation and the remedy, is to be found in *Mason v. Haile,* 12 *Wheaton,* 370. Also in *Bronson v. Kensey,* 1 *Howard* 315, where Chief Justice Taney says, " a state may undoubtedly regulate at pleasure the mode of proceeding in its courts, in relation to past contracts, as well as future." So also, in *McCracken v. Hayward,* 2 *Howard* 608, in which Judge Baldwin concedes the power of the state to " prescribe and shape the remedy." We might cite many other authorities, but it is not our purpose to go into a critical examination of the numerous decisions, bearing more or less directly on the question, which have been made in the Federal and State Courts. The distinction may, perhaps, be considered a nice one, and it may sometimes be very difficult to determine whether a law effects the remedy or impairs the right.

Nevertheless, without undertaking to criticise the wisdom of the distinction, it is surely enough for us to know that it has been authoritively settled and uniformly held by the federal tribunals. But whilst I say this, I must in candor admit that the cases of *Bronson v. Kensey,* and *McCracken v. Hayward* go further in favor of the theory that the existing law is incorporated into the contract, than any of the cases which preceded them ; and that they have a tendency, especially the latter, to confine the operation of the distinction between the right and the

remedy, within narrower limits, than is justified by previous decisions in the same court.

It is however, worthy of remark, in respect to these cases that they might have been decided on other grounds, without touching the constitutional question—that the court was not unanimous—that they were decided without argument on the constitutional question—and that in fact, they constitute an unwise departure from the settled practice of the court, never to decide so grave a question as the constitutionality of a state law, unless the question were necessarily involved in the decision of the case before the court. In neither of these cases was the question of the constitutionality of the laws of Illinois properly before the court for its decision.

By the act of Congress of the 29th September, 1789, it was provided " that the forms of writs and executions, except their style, in the circuit and district courts, in suits at common law, shall be the same in each state respectively, as are now used or allowed in the Supreme Courts of the same." And by the act of the 8th of May, 1792, this provision is substantially re-enacted, " subject to such alterations and additions as the courts respectively shall, in their discretion deem expedient."

On the 2d of March, 1793, congress by an other act declared in substance that writs of *fi. fa.* issuing out of the courts of the United States, should as to their execution, and the appraisement of property taken under them, conform to the practice in similar proceeding in the state courts.

Under this state of the law, the cases of *Wayman v. Southard*, 10 *Wheaton* 2, and *The Bank of the United States v. Halstead*, 10 *Wheaton* 51 arose, involving as it was thought, the constitutionality of certain laws of the State of Kentucky in relation to execution process; but the Supreme Court of the United States held that the acts of Congress of 1789, and of 1792 did not apply to States subsequently admitted into the Union; and that, as the Kentucky statutes had not been adopted by the Circuit

Court of the United States for the State of Kentucky, they did not apply to the United States Courts. The Supreme Court therefore declined to decide the question of the constiutionality of those laws.

In consequence of these decisions Congress passed the process act of May 19th, 1828, which declares " that writs of execution and other final process issued on judgments and decrees rendered in any of the Courts of the United States and the proceedings thereupon, shall be the same as are now used in the courts of the states." And it provided "that it should be in the power of the courts, if they see fit, in their discretion, by rules of court, so far to alter final process in said courts, as to conform the same to any change which may be adopted by the legislature of the respective states for the state courts."

By this law of 1828, the Circuit Court had authority to adopt the Illinois statutes in regard to final process. But its authority was to adopt them as a whole, and not in part only. The Circuit Court, however, undertook to alter and adopt them in part only, which was not warranted by the act of Congress of 1828, and so the Supreme Court held. Hence, there was no adoption of the Illinois statutes according to the meaning of the act, and the question of their constitutionality was not legitimately before the court for adjudication. And yet a majority of the Judges assumed, contrary to the settled practice of the court, to decide without argument, a grave constitutional question not properly before them, and the deciding of which was not necessary to the decision of the cases before the court. Judge McLean in dissenting from the opinion of the majority of the court says that the points certified from the Circuit Court, " would be answered by saying that the acts of the legislature referred to can have no operation in the case." And he expresses his regret that the court deemed it " necessary or proper to consider the constitutionality of the above acts, and holding them unconstitutional "—the decision of the matters before the court not requiring this judgment. And he remarks " it is the

The action in the case stated was on a *scire facias* at the suit of Cook, the plaintiff, on the recognizance of bail in the action before mentioned, against Gray, the defendant.

*Patterson*, for the plaintiff: The question in the case depended mainly on the statute passed since the revision of our statutes at large, passed at Dover, February 21, 1859, 11 *Vol. Del. Laws* 694, which repealed the last six lines of the pre-existing provision referred to in the case stated. Under that provision thus repealed, no writ of *capias ad satisfaciendum* could issue upon a judgment in this State by a non-resident without an affidavit filed by him alleging fraud in the mode indicated against the defendant; but since the repeal of that portion by the subsequent act referred to, no such prohibition or restriction now existed, and the law in regard to the matter, was consequently left just where it stood before the passage of the previous statute on which the defendant relied. The repealing act referred to was not invalid on the ground of unconstitutionality, or otherwise. Because it was not an *ex post facto* law within the meaning of that term, in its application to the present case, although it was not enacted until after the recognizance of bail on which this action was founded, had been entered into by the defendant. 3 *Sto. on Cons. sec.* 1345. *Calder v. Bull*, 3 *Dal.* 386. *Fletcher v. Peek*, 6 *Cranch* 138. *Ogden v. Saunders*, 12 *Wheat*, 206, 303, 329, 330, 335. *Watson et. al v. Mercer*, 8 *Pet.* 88. Nor because of its being retrospective in its application and operation, for judgment having been obtained against Goss, which *ipso facto* fixed the liability of his bail, neither of them had any vested right to have any particular process adhered to as preliminary to the plaintiff's availing himself of his legal remedies upon it. Any vested right appertaining to the case, rightfully belonged to the plaintiff to have any statutory impediments superimposed upon his common laws rights removed; and neither the Federal, nor State constitution prohibits the

58

legislature from passing retrospective laws generally. *Watson v. Mercer*, 8 *Pet.* 110. *Bennett v. Boggs.* 1 *Bald.* 74. *Satterlee v. Mathewson*, 2 *Pet.* 414. Even the Supreme Court of the United States cannot pronounce an act of a State legislature void as contrary to the federal constitution, merely because such an act divests vested rights of property. *Warren Bridge Case*, 11 *Pet.* 420. But the court will not declare a law to be unconstitutional, unless the conflict between it and the constitution is clear and palpable, and the presumption is always in favor of the validity of it. *Cooper v. Tellfair*, 4 *Dal.* 14. *Ex parte Mc Clelland*, 1 *Cow.* 550. 3 *Dal.* 386. 6 *Cranch* 87. 3 *Pet.* 447. 2 *Dal.* 309. 7 *Gill and Johns.* 7. 19 *Johns.* 58. 2 *Pet.* 522. 4 *Greenl.* 140. 6 *Ibd.* 412. It could not be contended that the repealing act in question impaired or affected the obligation of any contract with Goss, or with his bail, the defendant, but it related to and affected only the remedy or judicial process on the judgment by way of executing and collecting it, and when such was the case, it did not in contemplation of law and in the purview of the provision of the constitution of the United States on the subject, touch or effect, much less impair the obligation of the contract. 2 *Sto. on Cons. secs.* 1376, 1390. *Tharpley v. Hamer*, 9 *S. and M.* 310. *Stocking v. Hunt*, 3 *Denio* 274. *Mason v. Haile*, 12 *Wheat.* 370. *Bruce v. Schyler*, 4 *Gilm.* 221. 4 *Watts and Sergt.* 218. 1 *McLean* 35. 5 *How.* (*Miss.*) 285. And there was no doubt that in a general sense, the mode of process constitutes a part of the remedy. *Sto. on Conft. of Laws, sec.* 568.

But could a process which would be legal and valid against Goss, the defendant in the judgment, be illegal and invalid against the special bail, the defendant in this action? Or in other words, could the repealing act be constitutional and operative against Goss and at the same time unconstitutional and inoperative against Gray? The power of the legislature to interfere with vested rights, was it seemed unlimited, subject only to the restrictions to be found in the federal and state constitutions. *Butler*

v. *Palmer*, 1 *Hill* 324. *The People ex rel. Israel v. Tibbtz*, 4 *Cow.* 384, 392. *Cochrane v. Van Sorlay*, 20 *Wend.* 526. *The People v. Livingston*, 6 *Wend.* 526. *Mayor of New York v. Miln*, 11 *Pet.* 103. *Suydam and Boyd v. Broadnax*, 14 *Pet.* 67. 10 *How.* 395. 3 *Wash.* 313. But was there any vested right in, or any contract in this case with the special bail divested or impaired by the exercise of the sovereign and legislative power of the State in question? And what is the nature of the undertaking of special bail? Is it a contract within the purview of the constitution? A *sci. fa. sur. recognizance* is a judicial writ to have execution upon a debt of record. *Cresman v. People*, 3 *Gilm.* 351. *Beers et al. v. Haughton*, 9 *Pet.* 329. But a statutory bond taken in a proceeding like this, was not a private contract, but rather a statutory engagement. *Mason v. Haile*, 12 *Wheat*, 370. Had Goss been surrendered by his bail in this case, would the court have ordered his discharge on the ground of the passage of the act in question after the recognizance of bail had been taken? Certainly not; and if not, how then could the bail be discharged on that ground? For the doctrine was now clearly established that when the principal would be entitled to an immediate and unconditional discharge, if he had been surrendered, the bail will be entitled to relief by entering an *exoneretur* without any surrender. *Beers et al. v. Houghton* 9 *Pet.* 358. *Conely v. Griffen*, 3 *Harr.* 333. A ground that would not be sufficient for the exoneration of the principal, ought not to serve to exonerate the bail, more especially where it arose from the act of a superior power without the procurement, connivance, or consent of the plaintiff in the action.

*D. M. Bates*, for the defendant: Under the recognizance of bail and the law then in force, he denied that the bail was liable, without an affidavit of fraud had been filed against the principal before the *ca. sa.* was issued against him, unless the repealing act of 1859 changed the obligation of the bail, which it could not do under article 1,

section 10 of the constitution of the United States, inasmuch as it would impair the obligation of his contract. Before the act of repeal was passed, the bail was only qualifiedly liable; but after its passage, if it was subject to it, his obligation at once became unqualified and absolute. And that could not be done under the provision of the constitution before referred to. To change the obligation of a contract in any manner by adding to, or increasing it on the one side, or by removing, or diminishing the reciprocal obligation of the other party, was just as much an infraction of that provision of the constitution and an impairing of the obligation of it, as the unmaking, or the entire abrogation of the contract itself could be. 2 *Sto. on Cons. secs.* 1378, 1385. 3 *Wash.* 214, 257, 281, 302. *Sturges v. Crowninshield,* 4 *Wheat.* 122, 197. *Ogden v. Saunders,* 12 *Wheat.* 214, 257, 281, 302. *Camfrange v. Burnell,* 4 *Wheat.* 340. *Bronson v. Kinzie,* 1 *How.* 311. *McCracken v. Heyward,* 2 *How.* 608.

The obligation of a contract did not spring alone from the terms of it, but from those terms and the law as it existed at the time of the making of the contract in regard to the subject matter of it. Certain contracts contain in the express terms of them all that is to be done under them, as for instance, a bond for the payment of a sum of money simply. But there were many contracts, and classes of contracts in regard to which this could not be said, because they necessarily import and imply terms not expressed in them, and which may not even be apprehended by the parties at the time of entering into them, but which nevertheless are essential to the force, obligation and effect of them and which the law by implication incorporates in them, such as promissory notes, mortgages, and if he were called upon to suggest an especially apt illustration of one of the latter class, he would particularly mention a recognizance of bail. In the first class to which he had alluded the contract in terms contains no stipulation for days of grace, protest, or notice of non-payment after it, and yet in such cases, these

by operation of law become a part of the contract and enter into and constitute as much the obligation of it, as if they were in express terms embodied in it. And this was altogether independent of and distinct from the matter of the remedy on the contract, which he admitted the legislature might modify at its pleasure, without affecting or impairing the obligation of it. The cases which he had already cited not only distinctly recognize this principle, but would serve to show quite as clearly the manifest distinction on that point.

As to a recognizance of special bail, the obligation of the contract and the liabilities of the bail depended less on the terms of the instrument than upon the rules of the court in which it was taken and the principles of law applicable to it. *Beers v. Houghton*, 9 *Pet*. 356. If the requirement alluded to in the repealed provision of the statute which was in force when the recognizance of bail in this case was taken, constituted a condition of it in effect, then it was a qualified one, which the repeal of that provision afterward converted into an absolute and unqualified condition. But what is the nature of the obligation, or liability of special bail ? He is not a surety for the principal, nor is his obligation simply to pay the money sued for in case the principal fails to do so; but his obligation is primarily to produce his body in case he fails to satisfy the judgment, or voluntarily surrender himself into the custody of the law therefor, and therefore his obligation as special bail does not and cannot arise and has no practical effect until a *ca. sa.* has issued against the principal, and whatever discharges the principal from that, will entitle his special bail to an exoneration from the obligation of the recognizance. This is the primary obligation of the bail under the recognizance, and whatever qualifies this, qualifies his obligation as such, and whatever changes it, changes, and of course, impairs in the sense and meaning of the constitution, the obligation of his undertaking and engagement under it. *Beers v. Houghton*, 9 *Pet*. 356. 1 *Tidd. Pr*. 354. 9 *Wend*. 462.

The *ca. sa.* is issued merely to fix the liability of the bail, and is not a remedy upon the contract, or recognizance of the bail. The *ca. sa.* against the principal is therefore what determines and fixes the obligation of the bail; but it is not a remedy on the recognizance of the bail, because it must precede the determination of his liability upon it, and has no characteristic, or property whatever of a remedy upon his contract; because there can be no breach of the recognizance on his part until after the *ca. sa.* is issued against the principal and he has failed to be forthcomiug in response to it. When we speak of legal remedies, or a remedy at law, upon a contract in contradistinction to the legal obligation of it, although the one cannot exist without the other, it yet always imports legal process upon the contract itself to enforce the obligation of it because of the breach of it. There was therefore no reason for the contention that this case fell within the principle recognized in the cases cited on the other side, all of which related to the remedy upon and not to the obligation of the contract. To give such an operation therefore to the repealing act in question as had been contended for on the other side, would be to render it retrospective as to the obligation of it and not as to the remedy upon the recognizance of bail in the present case, which would have the effect even upon the authority of those cases, to render it, so far as this case was concerned, unconstitutional, inoperative and void. But is there after all, anything in the act in question to require the court to so construe it as to give it a retroactive operation? Was there anything in the terms of it which indicated that the legislature contemplated or intended that it should have any other effect or operation than such as usually attended upon the enactment of statutes by it, that is to say, that they are to have the force and effect of public laws from the date of their passage only, unless a clear and evident intention appears to the contrary; and unless it does so appear, the court will in no case give such a construction to a statute as to

impart to it any retrospective operation, or effect whatever. *Sedw. on Cons. and Stat. Law* 132. 2 *Show.* 17. 2 *Mod.* 310. 4 *Burr.* 2460. *Moore v. Duslen*, 2 *Exch.* 22. *Dash v. Vankleck*, 7 *Johns.* 477. *Johnson v. Burnill*, 2 *Hill* 238. *The People v. Curnal*, 2 *Seld.* 463. *Boyd v. Barringer*, 23 *Miss.* 421. *Plumb v. Sawyer*, 21 *Conn.* 351. *Duffiel v. Smith et al.*, 2 *Serg. and Rawle* 590. *Bedford v. Skilling et al.*, 4 *Serg. & Rawle*, 401. *Hasting v. Lane*, 15 *Maine* 134. 5 *Bac. Abr.* 836. 1 *Black. Com.* 46.

*Comegys*, for the same: If the repealing act in this case was to be considered as affecting the remedy only and the legislature may *ad libitum* interfere with and modify the remedy on the ground that it does not impair the obligation of the contract, or the recognizance of bail in this instance, then it would be perfectly competent for it to enact that the obligation of bail should become fixed and absolute on the recovery of judgment against the principal, without any *ca. sa.* whatever. But would that be in consonance with the undertaking and engagement of the bail, which was in the alternative, or originally conditional in its character only, that if the principal, the defendant in the suit, on the recovery of the judgment against him, did not surrender his body on such a writ being sued out against him, or the bail did not thereupon do it himself, then and in that event the latter should be liable for the amount so recovered against him? For such was the original condition and such was the original and only obligation of the bail in the recognizance; and although it might not have been embodied in exactly so many words, yet in contemplation of law and in point of fact it was as distinctly understood and implied in it, as if it had been inserted in it in so many express words, for the law made it a part of the recognizance. Well, if the unwritten, or common law made this a part of the obligation thus assumed by him, did not the express provision of the written law, or statute then existing and in force on the subject, equally make it at that time

one of the essential and necessarily implied terms and conditions which must precede the absolute ·completion and fixation of his obligation and undertaking under it, that there should also be an affidavit of fraud filed by the plaintiff in the suit, or some one for him such as the law then required in such a case, before the plaintiff should be allowed to sue out such a writ in order thus to fix and complete the obligation and liability of the bail for the debt? Were not therefore both of these precedent terms and conditions—and the latter quite as much as the former,—necessarily implied and understood, and by the law made most material and substantial parts of the contract of bail in this case, and effect and qualify in a most essential respect, if they do not in fact, constitute and compose his sole obligation under it? And was it then in the power of the legislature by any act which it could pass, to abrogate and abolish both, or either of these precedent terms and conditions, as well understood and implied, as if they had been expressly embodied in the contract at the time, without impairing the obligation of it, and making another and entirely different contract out of it? If so, he was at a loss to comprehend it.

It so happened in this case, that this very provision of the statute which it was now contended on the other side, was without prejudice or detriment in contemplation of law to the defendant in the present action, and did not impair or in any manner affect the obligation of his contract under the recognizance, constituted the chief consideration at the time which induced him to enter into it. Neither of the parties, the plaintiff, or defendant, in that suit, were citizens of, or resided in this State; but the defendant in that suit was well known to the defendant in this action, as a gentleman of high character and unimpeachable integrity, and as he had every reason to believe that no such affidavit of fraud, as the law then required and we insist still requires, could ever be filed against him, he, of course, had no hesitation, because he apprehended no danger, in entering into the recognizance

dollars on the execution of the agreement, six hundred
dollars without interest on or before the third day of
December ensuing, and on or before the day last men-
tioned, to convey by a good and sufficient deed of him-
self and wife a certain tract of land owned by him in said
hundred and containing about ten acres and valued at
three hundred dollars, to the said McIlvain, and on that
day to execute to the latter or to any other person whom
he might designate, a judgment bond and mortgage of
the premises so contracted to be sold to him as aforesaid
by the said McIlvain, to secure the payment of the residue
of the purchase money therefor as follows, viz : five hun-
dred dollars with interest on the whole of the residue of
said purchase, that is to say, on the sum of four thousand
four hundred dollars (the whole purchase money being
five thousand eight hundred dollars,) on or before the 1st
day of January, 1859, the further sum of seven hundred
and fifty dollars with interest on the residue of the pur-
chase money then unpaid, on or before the 1st day of
January, 1860, the further sum of seven hundred and
fifty dollars with interest as aforesaid, on or before the 1st
day of January, 1861, the further sum of one thousand
dollars with interest as aforesaid, on or before the 1st day
of January, 1862, the further sum of one thousand dol-
lars with interest as aforesaid, on or before the 1st day of
January, 1863, and the remaining part of said purchase
money, viz., the sum of four hundred dollars with inter-
est as aforesaid, on or before the 1st day of January, 1864;
and if either party thereto should fail to comply with the
stipulations therein contained to be kept and performed
on his part, he should pay to the other party the sum of
five hundred dollars as the measure of the damages.   And
it was stipulated on the part of the said McIlvain by a
postscript to the agreement that the said Daws should
have entire possession of the premises on the first day of
January ensuing.

No deed was ever executed by McIlvain to Daws for
the said premises pursuant to this latter agreement; but

61

on the 1st day of January, 1858, Thomas Catts and his wife conveyed by deed of bargain and sale the land so sold, to Daws for the consideration of five thousand eight hundred dollars; and on the 1st day of March, 1858, Daws entered into possession of the same. At the foot of this deed from Catts and wife to Daws was an endorse- ment signed and sealed by McIlvain that it was made with his consent and approbation; and the same was made in fulfillment of his said agreement with Daws. On the ex- ecution of the agreement between them and pursuant to the stipulations of it, Daws paid to McIlvain five hundred dollars, and the further sum of five hundred dollars on the execution of the deed from Catts and wife to him for the premises and at the same time executed and delivered to him his judgment bond and mortgage of the premises to secure the payment of the four thousand eight hun- dred dollars, the residue ·of the purchase money agreed to be paid, a part of which has since been paid by him to McIlvain and the bond and mortgage assigned by him to one Bryan who now holds the same. At the time of the conveyance, however, of the land by Catts and wife to Daws as above stated, the whole consideration money of the purchase from Catts by McIlvain was not paid; on the contrary, a considerable amount thereof was out- standing and unpaid until the 10th day of January, 1860, when the sum of two thousand two hundred and thirty- six dollars and eighty-seven cents was made by a sale of the real estate of McIlvain by the sheriff of the said county and applied to the judgment of Thomas Catts v. Henry W. McIlvain, Number 18 to April Term 1853 in the Superior Court of the State in and for said county and which judgment was given by McIlvain to Catts to secure the purchase money for the land mentioned in the agreement between them, and a part of which was sold and conveyed to Daws as aforesaid. The sum of seven thousand dollars with interest thereon, being the sum which McIlvain contracted to give for the land, had been paid by him to Catts prior to the articles of agreement

entered into by him with Daws, with the exception of the sum of two thousand two hundred and thirty-six dollars and eighty-seven cents, which sum remained unpaid until the 10th day of January, 1860; and that such prior payments were made for the most part by the bonds of purchasers with whom McIlvain contracted for the sales of portions of said lands, but who took their deeds therefor from Catts. It was also a fact that in addition to the possession of the land by a tenant of McIlvain as before stated in the case, McIlvain on sundry occasions between the date of the agreement between him and Catts and of the agreement between him and Daws, entered on the said lands and cut fence rails and posts for the use of his other lands. But no part of the purchase money for the land sold by McIlvain to Daws was applied to the payment of the seven thousand dollars, the consideration money to be paid to Catts by McIlvain under his agreement with him; but the said sum of seven thousand dollars was paid to Catts as before mentioned.

Previous to the said articles of agreement entered into between the said Henry W. McIlvain and the said William Daws for the sale by the former to the latter of the residue of said lands as aforesaid, that is to say, on the 19th day of October 1857, the plaintiffs in this case stated, the said John Flanagin & Sons obtained a judgment in the said Superior Court for the county aforesaid, against the said Henry W. McIlvain for the real debt of eight hundred and eighty dollars and fifty cents with stay of execution thereon for one-half of said debt until the 1st day of April, 1858, and for the residue of the said debt until the 1st day of October, 1858, on which a writ of *scire facias* was afterward sued out by the said plaintiffs against the said H. W. McIlvain and ter-tenants, on the 20th day of October, 1860, returnable to the October Term 1860 of the said court and at which term the same was returned by the sheriff of the said county, made known personally to the said Henry W. McIlvain, the defendant, and to the said William Daws, the defendant in

this case stated, among others as ter-tenants; no process of execution having in the meantime been issued on the said judgment.

On the foregoing statement of facts the following question of law was reserved for a hearing before all the Judges in the Court of Errors and Appeals : On the foregoing facts, is the land so conveyed to the said William Daws, subject to be taken in execution on the foregoing judgment of John Flanagin & Sons against Henry W. McIlvain ?   If the Court shall be of opinion that it is so subject, then judgment on the *scire facias* to be entered for the plaintiffs ; otherwise, for the defendant.

*Comegys*, for the plaintiffs : Upon the 3d day of September, 1857, McIlvain, then being the owner of the premises in question by virtue of the agreement with Catts, as set forth in the case stated which had just been read, entered into an agreement with Daws, the defendant, to sell and convey the same to him, which he afterward, however, did not strictly do ; but which Catts with his approbation and consent, did perform and execute for him, by conveying the same to Daws, by a deed of bargain and sale bearing date the 1st day of January, 1858, for the sum of $5800, and on the 8th day of March following, Daws entered into possession of them.   In the meanwhile, upon the 19th day of October, 1857, Flanagin & Sons, the plaintiffs, obtained the judgment in question against McIlvain for $880 50, and upon that state of facts arose the question of law presented in the case for the consideration and decision of the court.

A judgment was a lien, not only upon all legal, but also upon all equitable rights and interests in land in this State.   It had always been so, and so considered, from the earliest times, 3 *Binn.* 8 *per Tilghman C. J.* 1 *Yeates* 427. 2 *Yeates* 25. 2 *Binn.* 91. 2 *Dall.* 223, *cited in Clayton's note in* 1 *Vol. Del. Laws* 110.   And that must have arisen from the fact that the legal and equitable jurisdictions in this State were originally blended and united in the same

tribunals, until the formation and adoption of the consti-
tution of 1792. For he could find no case in which a
creditor had ever resorted in this State to a court of equity
to obtain satisfaction for his debt out of an equitable es-
tate. Such estates were always subject here to the pay-
ment of debts due by judgment or otherwise, against the
parties owning them. In the Orphans' Court equitable
interests in land are regarded and treated as real assets
for the payment of debts. *Brinckle's Case*, 3 *Ridgely's Notes*,
184. In dower cases in the same court, such estates are
regarded as bound by the lien of judgments at law.
*Lofland and wife v. Phillips*, 4 *Ibd.* 149. This doctrine
grew out of the fact, that before the constitution of 1792,
we had no separate court of chancery jurisdiction to which
a judgment creditor could resort to secure the benefit of
his legal lien against an equitable interest. Originally
equity jurisdiction was vested in the Court of Common
Pleas, *art.* 6, *sec.* 14, *constitution of* 1792. Equitable estates
therefore, stood upon the same footing precisely in this
State, as legal estates, so far as their liability for debts
was concerned; and by our statute in regard to the par-
tition and sale of the real estates of intestates, they were
by express provision placed in the same category. *Rev.
Code, chap.* 85, *secs.* 20, 21, 22, 23. Nor were they chat-
tels in the administration and settlement of personal es-
tates.

The alienation bond from Catts to McIlvain invested
the latter with an equitable estate in the lands contracted
to be sold by McIlvain to Daws by the agreement of the
3d of September, 1857, and that equitable estate thus
vested in him, became liable whilst it remained in his
hands unconveyed to another, to all liens acquired and
recovered against him; because, for all such purposes, his
title to them was in effect, a legal estate. The contract
between McIlvain and Daws was neither a conveyance,
nor an assignment of McIlvain's equitable estate in the
lands, but an agreement to convey the legal title in fee
simple; and he remained the owner of them at least, up

to the 1st of January, 1858, even if he ever parted with his equitable interest in them at all. It resulted from this, then, that until the conveyance by Catts and wife to Daws of the title contracted by Catts to be sold to McIlvain, judgments recovered against the latter, constituted liens on whatever estate, or interest he then had in the lands, and so continued to constitute liens upon that estate or interest, until at least, he parted with his interest in them to Daws. *Sug. on Vend.* 336, 345. 17 *Barb.* 139. By a statute in New York, an equitable estate in land is not liable to be seized and taken in execution on a judgment at law; but the law was otherwise in this State, and had been ever since the year 1701. 1 *Vol. Del. Laws* 109. And such was also the law in Pennsylvania. 3 *Binn.* 8. Up to the time that McIlvain parted with his interest in the premises to Daws, and up to the time that he agreed with Daws to sell and convey the lands in fee to him, he had paid to Catts in money and assignment of securities obtained on sales of portions of the lands in the meanwhile, as much as $5,537 03, and actually out of his own pocket in part payments under his own contract to purchase then of Catts, the sum of $890; and to that extent he had a good equitable estate in them. He therefore had at the time of his sale of them to Daws, to that extent, a substantial equitable interest in the lands, and not an interest existing in agreement, or contract merely, and at the same time, Daws was due him on his purchase from him, upwards of $4000, as would appear by the mortgage. If therefore the judgment of the plaintiffs was a lien upon the equitable estate, or whatever estate it might be called, which McIlvain at that time had in the lands, how was it possible that that lien could have been defeated, divested, or destroyed by the agreement merely of McIlvain to sell and convey to Daws, or even by the deed and conveyance of them to him, by another party, Catts and his wife?

*Smithers*, for the defendant: It had been ruled and held in the States in which they had no separate and distinct equity tribunals, that equitable estates in land were liable to be seized in execution and sold on judgments at law for the satisfaction of debts; but such was not, and never had been, held to be the law in any state or country in which there existed a distinct and separate legal and equitable jurisdiction. At common law, lands were not liable to be taken in execution for payment of debts. *Sel. Pr.* 53. And under the statute of Westminster only freehold lands could be extended on a writ of elegit. To remedy the mischief arising from the severance of the legal and equitable estates, the statute of uses, was enacted, but to bring a case within the operation of the statute, it was necessary that there should be a naked legal interest in one, with the whole equitable interest in another, the *cestui que use*, and no use could be raised by an agreement merely, like the one involved in the present suit. 1 *Cruise Dig.* 410. 2 *Crabb on Real Property*, *sec.* 1638. *Corn. on Uses*, 157 *note b*, 3 *Law Libr.* But the statute did not render equitable estates liable to execution; on the contrary, whenever it applied to the case, it merely executed the use, or made a more perfect estate by the union of the legal and equitable interests in the property in one and the same person, the party before entitled merely to the latter, or to the use. To make equitable interests *sub modo* extendible, the statute of 29 *Ch.* II was enacted, 1 *Cruise Dig.* 494; but that statute only related and applied to such equitable interests as existed at the time the execution was issued, and if there was an alienation of such interest after the recovery of the judgment, but before the execution was issued upon it, the equitable interest could not be seized and levied upon. *Bingh. on Execu.* 13 *Law Libr.* 46. *Haines v. Pugh*, 13 *E. C. L. Rep.* 459. *Kellogg v. Wood*, 4 *Paige* 619. *Ellsworth v. Cuyler*, 9 *Paige* 418, *Morissey v. Hill*, 9 *Iredell* 67. *Del. Laws*, *Vol.* 1 *p.* 109. But that statute only changed the law in allowing a sale, instead of confining the

remedy to a writ of 'elegit, and in subjecting all, instead of a moiety of the lands, to the process. It still required an inquisition, and if the lands would rent for a sufficient sum in seven years to pay the judgment, a writ of elegit had to follow it. Only such estates, or interests in land, as could be delivered on an elegit, could be taken under it in England; and the provision in our statute was in the same words. *Dig.* 1829 *p.* 204. And the later and present act made no change in it. *Rev. Code* 393. It was clear and certain that in England an estate liable to, or capable of being taken in execution at law, must be a legal estate, and also an estate of freehold, unless it was embraced within the purview of the statute of 29 *Ch. II. Wats. on Shffs.* 7 *Law Libr.* 150. *Scott v. Scholey et al.* 8 *East* 483. And such was the law also in this country, wherever there was to be found a separate equity jurisdiction established, or where such an equitable interest, as the one in question, had not been subjected to such process at law by positive statute. In Pennsylvania and other States where they had no separate equity courts, all the interests of a debtor, legal and equitable, were held to be bound at law and to be liable to be seized and sold on judgment and execution for the payment of his debts. And the reason for it there had been very well assigned in one of the cases cited on the other side from that State. *Cankruff v. Anderson*, 3 *Binn.* 9, as well as in the other cases cited to that point. But in all of the States of the Union in which that ruling and practice prevailed, it was rested entirely on the same grounds. *Bogart v. Perry*, 1 *Johns. Ch. Rep.*, 52. 17 *Johns. Rep.* 350. *Jackson v. Bateman*, 2 *Wend.* 570. *Henderson v. Hoke*, 1 *Dev. & Battle*, 137. *Allen v. Sanders*, 3 *Bibb*, 94. *White v. Karnalgh*, 8 *Richards*, 378. *Wolfe v. Dorrell*, 13 *Smedes & Mar.* 108. If such then was the law and the ground for it in those States, there could be no reason for the adoption of it in this State, and for which reason he was free to say that in his belief, it never had been adopted here; and therefore he had not been surprised to hear the declaration from the counsel for the

plaintiffs, that he had sought in vain for a precedent of it in the judicial records of this State, for with a Chancellor and a distinct court of chancery clothed with a general and comprehensive equity jurisdiction established for so many years in it, he could hardly expect to find any case within the present century at least, to warrant the decision now asked for in this suit.

*Comegys*, in reply, admitted that the rule established in England as well as in New York and other States from which the cases had been cited on the other side, was well settled, and that was, unless the trustee held the merely dry legal estate in the lands, the equitable estate of the *cestui que trust*, was not bound by the lien of the judgment at law, and, of course, was not liable to be seized in execution and sold upon it. Such he was prepared to admit, was the law in England and in the States of the Union in which they had a distinct and separate equity jurisdiction. But such had not been the rule of law in any of the States in which the legal and equitable jurisdictions had been originally united and exercised by their judicial tribunals, as was originally the case in this State, and was still the case in Pennsylvania; and where in consequence of that fact, the practice to the contrary was early adopted, ruled, recognized and established, and had ever since prevailed in them. As in the case cited from 3 *Binn.* 9, and as had been done in this State from the earliest period of our colonial history down to the present time, and which had never before been controverted, or called in question, until the present case had arisen and brought it here for adjudication by the court at this late day. And therefore it was, as he had before stated, that he had been unable after a most patient and protracted examination of the voluminous notes of the venerable Chancellor Ridgely, who so long filled his office with such distinguished ability, to find a solitary case in which a creditor, having a judgment, or a lien of any kind at law, had ever resorted to his jurisdiction, or tri-

bunal to obtain the payment of it out of an equitable estate, or for any remedy or relief in any such case against an equitable right or interest in lands and tenements in this State.

*Gilpin, C. J.*, delivered the opinion of the court: The question reserved in this case, for the consideration of the court is, whether the land conveyed by Thomas Catts and wife, to William Daws, on the 1st of January, A. D., 1858, is subject to be taken in execution, under the judgment recovered by John Flanagin & Sons against Henry W. McIlvain on the 19th day of October, A. D., 1857. In other words, whether the said judgment became a lien on that day upon the equitable interest or estate which McIlvain had in the land, at the time of the rendition of the judgment against him, which, it will be observed, was prior to the date of the conveyance of Catts and wife to Daws. It is to be remembered, that this is not the case of an active trust, where the interest of the *cestui que trust*, is sought to be affected. Of course, in such a case, the judgment would not be a lien, nor would there be any remedy at law. But the case of an active trust, differs most materially, from the case now under consideration.

The statement of facts agreed upon, discloses the case of a written contract for the sale and conveyance of land, by Thomas Catts to Henry W. McIlvain, for the sum of seven thousand dollars, payable by instalments, with interest,—Catts binding himself, upon payment of the purchase money, according to the terms of the contract, to convey the land to McIlvain in fee simple. Under this contract, and according to its terms, McIlvain went into, and continued in the actual possession of the land, and had paid to Catts, prior to the conveyance of the latter to Daws, upwards of two-thirds of the amount of the purchase money, with its interest, leaving a balance of only $2,236 87 of the purchase money and interest unpaid; which balance was amply secured to Catts by McIlvain, by judgment liens on other lands of the latter; and this balance, since the conveyance to Daws, has in fact been levied and made, out of those other lands.

It is perfectly obvious, therefore, that at the date of the entry of the judgment of Flanagin & Sons, McIlvain had acquired an equitable interest in the land in question, to at least, the extent of the amount of the purchase money which, up to that time, had been paid by him; and, as McIlvain had actually paid upwards of two-thirds of the purchase money up to that time, it would seem to follow, that his interest in the land, must have been equal in value to at least, two-thirds thereof. It has been said, that Daws entered into a written agreement with McIlvain for the purchase of the land in question, prior to the entry of Flanagin & Son's judgment, and that as a consequence, there exists an equity in his favor. This is true, so far as the fact of the agreement is concerned. But does the alleged consequence follow? It is equally true, that he was conversant with the terms of the contract between Catts and McIlvain, for in his own agreement, he expressly refers to the terms of that contract. And for upwards of two months, before he accepted the conveyance of the land from Catts, he had at least legal or constructive notice of the entry and existence of Flanagin & Son's judgment, for he was bound to take notice of the condition of the record. We are at a loss, therefore, under the circumstances, to discover any equity in his favor, against Flanagin & Son's judgment. He acted throughout with his eyes open. We are also at a loss to perceive the existence of any equity, in favor of Catts, because he was not only well secured at the time, for the balance of the purchase money, on other lands belonging to McIlvain, but by conveying the land in question to Daws, and knowingly, permitting Daws to execute a mortgage to McIlvain, for the purchase money, he released any equitable claim or lien, which he might otherwise have had against the land for the balance of the purchase money then due to himself from McIlvain.

It is true, in England at common law, a judgment was not a lien on an equitable estate. By the *statute* 29th *Charles* II, it was made liable to be taken in execution;

but then, the lien on the land was effected by the issuing of the writ, and not by force of the judgment.  But, apart from the ancient rule of the English common law, adopted in favor of the policy of feudal tenures, and in restraint of alienation, can there be, on principle, any valid reason assigned, why a judgment should not be a lien on an equitable estate?   At common law, too, lands were not liable to be taken in execution for payment of debts.  But this doctrine is now repudiated everywhere. And in this State, the " counties of New Castle, Kent, and Sussex, on Delaware," as they were formerly called, the policy of our laws, from the origin of the Government, has been, to favor alienation of estates, and at the same time, to protect and enforce the rights of creditors; and our legislation shows, there never was a time, in the " three lower counties " when lands were not liable to be taken in execution for the payment of debts.

Now, the question propounded to us for decision is, whether this equitable interest or estate of McIlvain's whichever it be called, was bound by the lien of Flanagin & Son's judgment?   We think this question must be answered in the affirmative.   And, therefore, we hold that it was so bound, notwithstanding the contract between McIlvain and Daws, and the conveyance of the land to Daws by Catts; and that Daws took the land subject to the lien, and of course, liable to be taken in execution under the judgment.   In order to show that this conclusion is sound, it is but proper to advert briefly, to our early history.   On the 4th day of March, 1680, William Penn, by Letters Patent under the great Seal of England, granted by Charles the II, acquired title to the Province of Pennsylvania; and on the 24th day of August, 1682, by two several deeds of feofment from James, Duke of York, he obtained title to the " three lower counties on Delaware," being the territories now constituting the State of Delaware.   By the act of Union, for annexing the three lower counties to the Province of Pennsylvania, dated the 10th day of December, 1682, it is provided that

" the counties of New Castle, Jones and Whorekills' *alias* New Dale, (as they were then called) shall be annexed to the Province of Pennsylvania, as the proper territory thereof; and that the people therein shall be governed by the same laws, and enjoy the same privileges in all repects as the inhabitants of Pennsylvania do." The first General Assembly of the representatives of the freemen of the Province of Pennsylvania and of the three lower counties on Delaware, met at Upland, *alias* Chester, in Pennsylvania, in the year 1682, and among their laws at that session, we find it enacted that " all lands and goods shall be liable to pay debts, except where there shall be legal issue, and then all the goods and one-half of the land only, unless the land was bought before the debts were contracted." In the year following, we find another law, declaring that whatsoever estate any person hath in this province or territories thereof, at the time of his death, shall be thus disposed of—one-third to his wife, one-third to the children equally, and the other third as he pleaseth, and in case his wife be deceased before him, two-thirds to the children equally, and the other third to be disposed of as he shall see fit, his debts being first paid. By another law passed in the year 1688, after stating in the preamble, that forasmuch as by a law made at Upland all lands were made liable to pay debts, with such restrictions and limitations as are therein expressed, for the fuller and more satisfactory explanation and alteration of the same, it was enacted that " all lands whatsoever, and houses, shall be liable to sale upon judgment and execution obtained." This law was temporary in its character, and expired by the terms of its own limitation. It was to continue for one year, and until the rising of the then next General Assembly, and for twenty days thereafter, and no longer. It evidently referred to the law of 1682 on the same subject. Again, in the year 1694, the Governor, by and with the advice and consent of the General Assembly, passed another law containing precisely the same preamble and enacting that " all lands whatsoever,

and houses," should be liable to sale upon judgment and execution. This act was without limitation as to duration. Then, in the year 1700 we find another law, by which, after reciting, that, to the end that no creditors may be defrauded of the just debts, due to them by persons of this province or territories who have sufficient real estate, if not personal, to satisfy the same, it is again enacted that " all lands and houses whatsoever, within this government, shall be liable to sale upon judgment and execution obtained against the defendant, the owner, his heirs, executors or administrators, where no sufficient personal estate is to be found." " All lands whatsoever "—" all lands and houses whatsoever." Did not the makers of these laws intend that they should have a very comprehensive application ? Is it not manifest that they intended to include and subject to execution and sale, every discription of estate or interest legal or equitable, which a person might have in lands or houses, except where the same was the subject of an active trust ? Can it be said that this is a forced construction of these laws, when we consider the very informal and imperfect character of contracts in relation to, and conveyances of, lands, during the early settlement of these counties, and when we remember, too, that there was as yet, no court of chancery, or other court exercising equity power, in existence ? Indeed, it is not too much to say, that this view of the subject seems to be strengthened, if not confirmed, by an act passed in the year 1721, in which it is declared, that " divers laws have been enacted in this government that made all lands and tenements, without any regard to the fee simple or other tenure by which they are held, as liable to pay debts as chattels, and to be taken and sold upon executions."

Now, it is proper to observe, that all these laws applied equally to the province of Pennsylvania and to the three lower counties. They were subject to one and the same propriety government, the same legislature, to the same laws, and to the same judicial system, up to and includ-

ing the year 1701. In the month of October of the year last named, however, a difficulty arose in the General Assembly, in regard to the proposed confirmation of certain laws which had been passed the year before at New Castle; and although many attempts were made by the Deputy Governors and Council, to reconcile the difficulty, and to perpetuate the union of the legislative branch of the government, they all ended in failure. The last attempt at reconciliation was made in the month of April 1704. After which, the members from the three lower counties finally withdrew from the union; and from this time forth, the freemen of the three lower counties, with the consent of Mr. Penn, as provided for in the charter of privileges, had a separate and independent legislature of their own. The judiciary system, however, remained the same, until some time between the years 1726, and 1736. The laws subjecting lands to sale for the payment of debts, remained the same, and have so continued up to this day. And indeed, the general legislation of the province of Pennsylvania, and of the three lower counties, continued to be almost identical up to the time of the Declaration of Independence in 1776. But at some period between the years 1726, and 1736, probably about the year 1732, the General Assembly of the three lower counties, authorized the county court of Common Pleas, a common law court, composed of Justices of the Peace of the several counties, to hold courts of equity. We have here, then, a period of about fifty years, during which there existed no court in these counties, vested by law with equity jurisdiction. And, it follows, as a matter of course, that up to this time the administration of justice in these counties, must have been according to the forms of the common law. Within these counties, a judgment recovered before the proper tribunals for the purpose has always been held to be a lien upon real estate. Our earliest legislation shows this. Can it be supposed then, for an instant, that there ever was a time when there existed no remedy anywhere, for enforcing payment of a

judgment out of an equitable estate? We know that for a period of about fifty years there was no court of equity to which resort could be had. If, therefore, there existed at that day under our then system any remedy whatever in such a case, it could only be found in the courts of common law, and through the instrumentality of common law forms. And although it is true, that the legislature, after the lapse of the period just mentioned, did confer equity powers on the Justices of the court of Common Pleas; yet it is quite manifest from the record of their proceedings, that they did not exercise a general equity jurisdiction, but on the contrary, confined themselves almost entirely, if not exclusively, to injunctions for staying suits at law, and stopping waste, the perpetuating of testimony, and in establishing the boundaries of lands. This state of things continued, so far as we have any knowledge, up to the time of the adoption of the constitution of 1792, for the constitution of 1776 had made no material change in the equity jurisdiction. It merely provided that "the Justices of the courts of Common Pleas and Orphans' Courts shall have the power of holding inferior courts of chancery as heretofore, unless the legislature shall otherwise direct." The constitution of 1792 created a court of chancery, and the office of Chancellor. The 14th section of the 6th article provided that "the equity jurisdiction heretofore exercised by the Judges of the Court of Common Pleas, shall be separated from the common law jurisdiction, and vested in a chancellor, who shall hold courts of chancery in the several counties of this State." An equitable interest, such as McIlvain's, is not a mere chattel interest. It would not go to executors in case of his decease; it is an inheritable interest, and would descend and pass, to his heirs at law, subject to dower, according to the order prescribed by our intestate laws. In all respects, under our system, it is treated and disposed of as real estate. Our statute of February 5th, 1827, expressly declares, that, "when any person having title, or any manner of right, legal or

equitable, in any lands, tenements or hereditaments in fee simple, shall die intestate as to the same, such lands, tenements or hereditaments shall descend and pass in fee simple to the kindred male and female of the intestate in coparcenary." And this has always been the law in these counties. In Pennsylvania, under precisely the same laws, for the sale of lands for the payment of debts, and under a similar judicial system during a large portion of our history, it was alway held that a judgment was a lien on an equitable interest such as this, and that all possible titles, equitable, contingent or otherwise, were subject to sale upon judgment and execution. 1 *Yeates* 427. 2 *Yeates* 25. 2 *Bin.* 91. 3 *Bin.* 49. 16 *Serg.* 431. 5 *S. & R.* 129. 8 *S. & R.* 440–1. 2 *Watts* 10, 15, 16. 8 *W. & S.* 186. *Stephen's Appeal.* The doctrine established by the courts of Pennsylvania, as we understand it, is not based, in any respect, upon the 29 *Charles* II, but grew up under their own system of laws. And we think the same doctrine should be held to prevail in this State, at least, so far as equitable interests of this character are concerned. Of course the purchaser at sheriff sale, would take the land subject to such equities as might exist in favor of the original vendor, in respect to any balance of unpaid purchase money. Such purchaser would be subrogated as to the right and interest of the original vendee, and would stand in his shoes. He would take the interest of the original vendee, no more and no less.

It has been contended by the counsel for the defendant, that, if there be any remedy at law here, to recover a debt out of an equitable interest in lands, it must be by force of *chapter 2, section 3, of statute* 29 *Charles II,* which gives a lien to the writ of execution, but not to the judgment under which it was issued; and that, according to the construction given to the statute, if the trustee had conveyed away the lands by the direction of the *cestui que trust,* before execution sued, they could not be taken in execution; and that consequently in this case no writ of execution having been issued and the lands hav-

ing been conveyed away, the judgment creditors are without remedy at law against them. Now it might be a sufficient answer to this suggestion, to say, that section 3, of chapter 2, of the English statute, has never been held to be in force in Pennsylvania or in Delaware. It is true that *statute* 29, *Charles* II, was enacted prior in time to the grants made to William Penn. But when we remember that it is a well settled principle in regard to colonization, that the emigrants from the mother country carry with them only such laws or parts of such laws, as are deemed useful and adapted to the exigencies of their new situation, the fact that the provision of the statute just referred to, has not been recognized here, as a part of our law, is satisfactorily accounted for; more especially, as they established from the beginning of our Colonial history, as they had a right to do, an independent system of their own, for enforcing the payment of debts.